**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Garland JEFFERS et al., Defendants-Appellants.**

**Nos. 74–1650, 74–1680.**

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1975.

Decided July 30, 1975.

Rehearing Denied Aug. 28, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 805.

---

Chester L. Blair, Chicago, Ill., Max Cohen, Gary, Ind., for defendants-appellants.

John R. Wilks, U. S. Atty., Fort Wayne, Ind., Richard A. Hanning, Joseph S. Van Bokkelen, Asst. U. S. Attys., Hammond, Ind., for plaintiff-appellee.

Before MOORE,* Senior Circuit Judge, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

The principal question presented by this appeal is whether the failure of defense counsel to conduct a thorough cross-examination of a former client who testified as a prosecution witness requires reversal of a conviction for a conspiracy to distribute heroin and cocaine.[1] Additionally, defendants contend that the court erred by failing to suppress certain physical evidence and statements, and defendant Warner S. Smith argues that the evidence of his participation in the conspiracy was insufficient to support his guilty verdict.

### I.

The government proved that defendants were members of a highly-structured and on-going narcotics distribution network in the Gary, Indiana, area known as "the Family." During the morning of the sixth day of trial, the

---

* Senior Circuit Judge Leonard P. Moore of the Second Circuit is sitting by designation.

1. Seven defendants were indicted and found guilty by a jury of conspiracy to distribute heroin and cocaine, prohibited by 21 U.S.C. § 841(a)(1), in violation of 21 U.S.C. § 846. Each defendant received a 15-year jail sentence and a substantial fine.

Garland Jeffers, fifteen (15) years—$25,000.00 fine;

Warner Smith, fifteen (15) years, under the provisions of 18 U.S.C. § 4208(a)(2)—$5,000.00 fine;

Leroy Williams, fifteen (15) years—$2500.00 fine;

Nathaniel Jeffers, fifteen (15) years, under the provisions of 18 U.S.C. § 4208(a)(2)—$7500.00 fine;

Cecelia Willis, fifteen (15) years, under the provisions of 18 U.S.C. § 4208(a)(2)—$10,000.00 fine;

Clinton Bush, fifteen (15) years—$2500.00 fine;

Paul Griffin, fifteen (15) years—$2500.00 fine.

government called as a witness James Berry, a former member of the Family. As Berry took the stand, counsel for defendants, Max Cohen,[2] approached the bench and informed the court and the government that Berry had been represented by a partner of his in a prior state court homicide case. Cohen explained that he had had no knowledge that Berry would be called as a witness. He continued:

> This places us in an irreconcilable conflict where a witness for the Government is a former client of our firm, and if—we would, if the Government proposes to insist upon calling him, it is ethically incumbent upon us to request the Court for leave to withdraw as counsel for these defendants. Tr. 996.

Prosecutor Van Bokkelen admitted that the government had thought about the possible conflict, but that he did not consider that any conflict of interest resulted from the fact that a partner of Cohen's had obtained an acquittal for Berry in late 1972. Tr. 996–997. On the basis of this information, the court ruled:

> I find nothing in the record right here that indicates any conflict of interest right at this time other than the—the only fact I find that is possible to establish any conflict of interest is the fact that this was a former client that the defense law firm represented successfully and got acquitted, and I don't think that establishes it, gentlemen.
>
> I appreciate your bringing it to my attention and I hope I am as sensitive

about this as anyone. I know you gentlemen all are.
Tr. 1000.[3]

The government then suggested that if, during cross-examination, defense counsel found themselves in a quandary over the use of information possibly received in confidence from Berry, they could approach the bench for a ruling on its use. Tr. 1001. *See also* Tr. 1003.

Cohen repeated that he had never seen Berry before,[4] and that he personally possessed no confidential information. Tr. 1001–1002. He agreed with the court that, therefore, he could not breach the attorney-client privilege. Tr. 1002. But he repeated his motion

> for leave to withdraw as counsel and permit these people to obtain other counsel. I have to make that motion. I am ethically obliged to make that motion.

*Id.* The judge once again stated that he found no conflict and denied the motions, and the direct examination of Berry was conducted. Tr. 1004. During his 55-page testimony, Berry effectively implicated all of the defendants, with the exception of Warner Smith, in the conspiracy.

The direct examination of Berry also brought out certain facts bearing on his credibility. He acknowledged personal participation in extensive criminal activities; he testified that in February, 1974, he had been disciplined by the Family, more particularly, that he had been shot by several parties, including the defendant Garland Jeffers. Tr. 1059–1060. His status as an informer was, of course, apparent and his demeanor when testify-

---

**2.** Cohen was assisted by a Mr. Levinson, a partner in his law firm.

**3.** Cohen's sensitivity in this respect is understandable. In an earlier case he had been appointed to represent a bank robber. Subsequently, the client sought post-conviction relief, claiming that he had been denied effective assistance of counsel because Cohen was subject to a conflict of interests because of his alleged business connections and prior dealings with the bank. We reversed the district court's dismissal of the client's petition and

remanded for a hearing to determine the extent of Cohen's involvement with the bank and the existence of any conflict of interest. *Zurita v. United States,* 410 F.2d 477 (7th Cir. 1969). On remand, however, the district court found that no such conflict existed, and this judgment was affirmed by us in an unreported order. No. 71–1070 (7th Cir., Jan. 20, 1972).

**4.** Similarly, Levinson, Cohen's associate counsel, stated that he had no knowledge of the witness. Tr. 1003.

ing against former business associates was subject to observation by the jury.

At the close of direct examination a short recess was held. When the jury returned, Cohen questioned Berry about his prior representation by the firm of Cohen & Thiros. In addition to the homicide acquittal in late 1972 or early 1973, it was learned that the firm had represented him after his arrest on a later charge of visiting a common nuisance. Cross-examination further developed the fact that Berry had agreed to become a witness for the government after he "found out that the Family was looking for me to do something to me because I left." Tr. 1064. When Cohen suggested that that would have been about June 3, 1974, Berry disclaimed knowledge of the exact date. Cohen further brought out the fact that Berry had not informed any member of Cohen's law firm that he was going to testify as a witness for the government. At this point, Cohen once again requested leave to withdraw on the conflict of interests ground and sought leave to make the motion before the jury "so that the jury will know why I cannot cross examine this witness." Tr. 1065.[5] The court repeated that it did not find any conflict "of any kind," and denied both motions. Tr. 1067–1068.

At this point Cohen disclosed that, during the recess, his associate had contacted the partner who had represented Berry in the past.

We have become privy to information, to matters and specifics, concerning this witness which we could only have obtained as a result of Mr. Thiros' representation; that, perhaps, another lawyer might have obtained the same information, but we obtained our information only as a result of our representation.

Now I feel that on this state of the record, it is incumbent upon this firm to withdraw . . ..

Tr. 1069. The government responded by repeating its suggestion that, if any problems regarding confidential communications came up, Cohen could approach the bench and seek a ruling on their use. Tr. 1070. At this point the court recessed for lunch.

Upon resuming, the district court reported on its research and deliberations.

I see nothing in the record at this time that even remotely points in any direction that the defense counsel cannot properly and completely cross examine this witness.

* * * The record indicates that the employment between, professional relationship between this witness and defense counsel and their firm has now been terminated, apparently successfully, in both instances as to the witness.

*     *     *     *     *     *

* * * That is my ruling. You are instructed to continue with the trial. The motion is denied.

Tr. 1077–1078.[6] Cohen then informed the court that during the noon recess he had informed his clients of the situation.

My clients do not waive the conflict. My clients have advised me that they request new counsel.

Tr. 1079. The court denied the request. Id.

Berry was returned to the stand for cross-examination. He testified that his prior representation by Thiros had involved activities allegedly committed while he was a member of the Family. Cohen then asked him four questions that established that even though Berry had been connected with the Family "almost from the beginning of it," he did not know defendant Warner Smith to be a member of the Family. Tr. 1081. The entire cross-examination, excluding the colloquy with the court, covered only about three pages of the transcript. Tr.

5. We find no merit in the government's argument that this statement indicated that Cohen had never intended to cross-examine Berry.

6. The judge announced that he had reviewed the Canons of Professional Responsibility and had sought the advice of two of his three colleagues with respect to this matter.

1061, 1063–1064, 1080–1081. At this point Cohen stated, "That's all," and once again approached the bench. He told the court:

I have no further cross-examination for the reasons I have thus far stated, that I am in a conflict situation.

Tr. 1082.

The trial judge responded:

Mr. Cohen, the Court now instructs you to complete the cross examination of this witness on the basis of the law and the evidence and on the basis of the direct examination of this witness.

*Id.* Cohen once again asserted the problem of the confidential information and the fact that his clients no longer wished him to represent them. The court repeated its conclusion that the record did not disclose a conflict of interests, and if "problems arise, we will deal with them." Tr. 1086. Cohen announced that he had no further cross-examination and sat down. Berry was excused. *Id.*

Cohen made no request for a continuance to enable his client to obtain additional counsel for the purpose of cross-examining Berry, or to complete the trial; he made no effort to disclose the privileged information to the court *in camera* to enable the court to evaluate its relevance to possible cross-examination; he made no representation that the privileged information was inconsistent with any of Berry's direct testimony or, indeed, that it was directly relevant to that testimony, nor did he indicate whether the information pertained to the period when Berry was a member of the Family; Cohen made no offer of proof with respect to matter that might be disclosed by further cross-examination. Finally, he made no formal motion to withdraw or to substitute other counsel. He continued to represent the defendants for the balance of the trial and,

indeed, in the presentation of the appeal in this court.

The defendants themselves never addressed the court personally. The record indicates that they had both the intelligence and the means with which to retain additional counsel, and, since Berry was a former member of the Family, it is fair to infer that they were in possession of significant information about him that could have been imparted to counsel without violating any professional privilege. Berry himself never asserted any claim of privilege.

The closing argument for the defendants was presented in two parts, first by Mr. Levinson and then by Mr. Cohen. Mr. Levinson stressed the unreliability of informer testimony, quoting, in part, the relevant instruction later given by the court, Tr. 1660–1661, and also reminded the jury that Berry had specifically testified that defendant Warner Smith was not a member of the Family. Tr. 1683. In Cohen's portion of the closing argument he pointed out that Berry had been a client of his firm and stated:

Ethical considerations preclude me from commenting upon the testimony of Mr. Berry.[7]

We first consider whether the district court was correct in ruling that Cohen was not disqualified from cross-examining Berry by a conflict of interests, and then, even if that ruling was correct, whether Cohen's refusal to conduct a more thorough cross-examination than he did nevertheless requires reversal. Thereafter we discuss the defendants' other contentions.

## II.

The Sixth Amendment's[8] guarantee of Assistance of Counsel necessarily requires that a criminal defendant be

---

7. We find no merit whatsoever in this argument. Moreover, we note that Mr. Levinson did not hesitate to comment on the portion of Berry's testimony that tended to exonerate defendant Smith.

8. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and

district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

represented not only by counsel satisfying at least a minimum standard of professional competency,[9] but also by counsel whose undivided loyalties lie with his client.[10] The record before us unambiguously demonstrates that Cohen satisfied these requirements. His competence is unchallenged and is demonstrated by the record. Apart from the possible conflict of interests question which he promptly brought to the attention of the court, there is nothing whatever in the record to raise any question about the fidelity of his performance of his professional obligations to his clients. He continued to represent their interests effectively in the trial court, both before and after Berry testified, and has loyally prosecuted this appeal even though it involves a confession that he may have made an erroneous professional judgment during the course of trial. We therefore start from the premise that defendants were well represented in all respects with the possible exception of Cohen's handling of the witness Berry.

■■ On that subject we agree with the district court's conclusion that a disabling conflict did not exist. As a matter of procedure we first note that both defense counsel and the trial judge properly addressed the issue as soon as it arose.[11] We also emphasize at the outset that this is not a case involving an existing personal relationship between Cohen and the witness Berry.[12] Consequently,

---

9. *See United States ex rel. Williams v. Twomey,* 510 F.2d 634 (7th Cir. 1975); *Matthews v. United States,* 518 F.2d 1245 (7th Cir. 1975).

10. As the Supreme Court explained in *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680, where counsel was appointed to represent two different defendants at the same trial:

"[We are] clear that the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired."

As the Fifth Circuit has explained:

"Such representation is lacking, however, if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents—as a vigorous advocate having the single aim of acquittal by all means fair and honorable—are hobbled or fettered or restrained by commitments to others." *Porter v. United States,* 298 F.2d 461, 463 (5th Cir. 1962). *See also* Canon 6, A.B.A. Canons of Professional Ethics.

11. Defense counsel is obligated to bring to the attention of his client and the court any possible conflict of interest that develops at trial as soon as he becomes aware of such a situation.

American Bar Association Standards For Criminal Justice, The Defense Function § 3.5(a) (1971):

"At the earliest feasible opportunity defense counsel should disclose to the defendant any interest in or connected with the case or other matter that might be relevant to the defendant's selection of a lawyer to represent him."

Cohen clearly satisfied this obligation in this case. He approached the bench and informed the court of the prior representation problem as soon as he learned that Berry would testify.

At this point, it became the duty of the district judge to seek out the facts surrounding the alleged conflict and to determine whether counsel's continued representation of his clients would be consonant with the strictures of the Sixth Amendment.

As the Second Circuit has explained:

"In such circumstances, the district judge should conduct a hearing to determine whether there exists a conflict of interest with regard to defendant's counsel such that the defendant will be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the sixth amendment. In addition, the trial judge should see that the defendant is fully advised of the facts underlying the potential conflict and is given an opportunity to express his or her views." *United States v. Alberti,* 470 F.2d 878, 881–882 (2d Cir. 1972), *cert. denied,* 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311.

A similar situation involving a surprise witness occurred in *United States v. Donatelli,* 484 F.2d 505 (1st Cir. 1973).

Here the trial judge was fully apprised of the extent of the conflict as Cohen recognized it by the statements of Cohen and the answers of the witness Berry. Cohen explained the conflict to his clients, and told the court that they desired to have new counsel.

12. The record before the district court disclosed that Berry, although a client of another member of Cohen's law firm on two prior oc-

the numerous cases involving an on-going relationship between an adverse witness and a lawyer are inapposite.[13]

■ In cases in which the alleged conflict of interest is based on the prior representation of a prosecution witness by defense counsel, the courts have examined the particular circumstances to determine whether counsel's undivided loyalties reside with his current client.[14]

In such cases there are two factors that arguably may interfere with effective cross-examination and, therefore, the effective assistance of counsel. First is concern that the lawyer's pecuniary interest in possible future business may cause him to avoid vigorous cross-examination which might be embarrassing or offensive to the witness.[15] The second is the possibility that privileged informa-

casions, had no present relationship with the firm. In his brief on behalf of defendants on appeal, Cohen now informs us that a member of the firm is currently counsel of record for Berry in a case pending in the Gary City Court. This new information cannot change our analysis of the conflict present before the district court, however. For at that time Cohen, the trial judge, and apparently Berry himself believed that only a question of past representation existed. The inhibitions Cohen felt and expressed about cross-examining the witness stemmed solely from this prior relationship.

In *Commonwealth v. Geraway,* 301 N.E.2d 814 (Mass.1973), defense counsel's firm, unbeknownst to him, represented certain of the witnesses against the defendant. The Massachusetts Supreme Court agreed with the trial court that the knowledge of such dual representation could not be imputed to defense counsel. It noted his vigorous cross examination of these witnesses and concluded there was "slight, if any, possibility of prejudice to Geraway." 301 N.E.2d at 817. Defendant's conviction was reversed and a new trial was ordered, over a strong dissent, under the court's supervisory authority, and not because of any Sixth Amendment violation.

**13.** The courts have frequently held that the existence of such a relationship, with the inherent attendant hesitancy of counsel to completely cross-examine a current client, creates a very real conflict of interest and requires a mistrial if the conflict is disclosed, or a new trial, if the ·conflict is discovered only later. *See Castillo v. Estelle,* 504 F.2d 1243 (5th Cir. 1974); *Porter v. United States,* 298 F.2d 461 (5th Cir. 1962); *Taylor v. United States,* 96 U.S.App.D.C. 379, 226 F.2d 337 (1955); *District of Columbia v. Scott,* 94 U.S.App.D.C. 227, 214 F.2d 860 (1954); *United States ex rel. Williamson v. LaVallee,* 282 F.Supp. 968 (E.D. N.Y.1968); *United States ex rel. Miller v. Myers,* 253 F.Supp. 55 (E.D.Pa.1966); *People v. Stoval,* 40 Ill.2d 109, 239 N.E.2d 441 (1968); *cf. Randazzo v. United States,* 339 F.2d 79 (5th Cir. 1964). *But see Weaver v. United States,* 263 F.2d 577 (8th Cir. 1959), *cert. denied,* 359 U.S. 1014, 79 S.Ct. 1154, 3 L.Ed.2d 1038; *Hayman v. United States,* 205 F.2d 891 (9th Cir.

1953), *cert. denied,* 349 U.S. 959, 75 S.Ct. 889, 99 L.Ed. 1282.

In *Zurita v. United States, supra,* n. 3, we ordered a remand for a hearing to determine exactly the nature of Cohen's on-going relationship, if any, with the robbed bank. We noted that

"if attorney Cohen were shown to have actually represented the bank at a time when the bank's interest in petitioner's trial conflicted with that of petitioner, we would be presented with a situation so 'fraught with the dangers of prejudice,' that a new trial would be required." 410 F.2d at 480, quoting *People v. Stovall,* 40 Ill.2d 109, 113, 239 N.E.2d 441, 443 (1968).

In his concurring opinion Judge Fairchild expressed the view that the district court should not set aside the conviction unless the evidence showed "a probability that the relationship between petitioner's retained counsel and the bank was sufficient to and did cause counsel to be ineffective in representing petitioner."

**14.** *See United States v. James,* 505 F.2d 898 (5th Cir. 1975); *United States v. Cochran,* 499 F.2d 380 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825; *United States v. Donatelli,* 484 F.2d 505 (1st Cir. 1973); *United States v. Alberti,* 470 F.2d 878 (2d Cir. 1972), *cert. denied,* 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311; *United States ex rel. Kachinski v. Cavell,* 453 F.2d 581 (3rd Cir. 1971); *Harrison v. United States,* 387 F.2d 614 (5th Cir. 1968); *Olshen v. McMann,* 378 F.2d 993 (2d Cir. 1967), *cert. denied,* 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157; *Commonwealth v. Smith,* 291 N.E.2d 607 (Mass.1973).

**15.** This type of concern may have motivated the Ninth Circuit to order a remand for a hearing on the charges of conflict of interests in *Tucker v. United States,* 235 F.2d 238 (1956). Tucker had sought to collaterally attack his conviction on a charge of bank robbery by alleging that his trial counsel had previously represented the chief government witness, the manager of the robbed bank, in a civil matter and that counsel had only perfunctorily investigated the case before trial and cross-examined the witness, desiring to stay in his former client's good graces.

tion obtained from the witness might be relevant to the cross-examination.

■ The first of these factors is clearly not significant here. Looking strictly at the lawyer's pecuniary interests, it is manifest that the relationship with the leaders of the Family who were then on trial had much greater value to Cohen's firm than any work they had done, or might do in the future, for the witness Berry. Of greater importance, however, is the presumption that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand. The entire record in this case is consistent with that presumption; there is no basis for speculating that the mere possibility of some additional work for Berry would have impaired in the slightest Cohen's undivided loyalty to the defendants on trial.

■ The second factor is more difficult to assess. Cohen did advise the court that, as a result of the conversation with his partner, he was in possession of confidential information relevant to a possible cross-examination. Such information could create difficulties for the cross-examiner in two different ways. Most obviously, there might be a temptation to use the information to impeach the former client. We do not regard this risk as serious, however, for we think the courts can generally rely on the sound discretion of members of the bar to treat privileged information with appropriate respect. Moreover, in cases in which this concern does seem significant, it is the witness, rather than the defendant, who should object to the cross-examination by his former attorney. Here Berry asserted no claim of privilege and voiced no concern about Cohen's possible violation of his ethical responsibilities.

■ The more difficult problem which may arise is the danger that counsel may overcompensate and fail to cross-examine fully for fear of misusing his confidential information; he might thereby fail to inquire into legitimate areas of concern. If counsel should not recall the exact source of information, there is a possibility that fear that it may have been obtained in a privileged manner may lead him to exclude the entire subject from cross-examination. We recognize that such difficulties may exist, but they would only affect counsel's ability to ask questions relevant to the privileged information. The risk that an item of confidential information might be misused does not create a conflict of interest which disqualifies an attorney from conducting any cross-examination at all.

■ The suggestion repeatedly made by the government and adopted by the court would have provided adequate protection to the interests at stake. Thus, if defense counsel was concerned that he might be using confidential information improperly, he could have outlined the nature of the information to the judge and, if necessary, made an *in camera* disclosure to him. On the basis of such a disclosure it might have become apparent that the privilege was either inapplicable or had been waived by the witness. Or, it might have been clear that the information was not usable for other evidentiary reasons. The witness himself could have been consulted to determine whether he would insist on the maintenance of the privilege.

■ If it were determined that such information was privileged, the witness could not, of course, have been questioned about it. The fact that an attorney is unable to pursue one line of inquiry does not mean, however, that the defendant is receiving inadequate representation. For, as the Second Circuit explained in *United States v. Alberti*, 470 F.2d 878, 881 (1972), *cert. denied*, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311:

> [W]e cannot understand how other counsel could be expected to ask the question that Alberti suggests; for, unless either [counsel] breached the attorney-client privilege or [the witness] waived it, any other counsel would

have been totally without knowledge of what [the witness] had told [counsel]. As a result, not only would other counsel not have asked the suggested question, but he would also not have been in a position to cross-examine [the witness] as thoroughly and vigorously as [counsel] did.

Here, Cohen did not indicate to the district judge the nature of the confidential information he claimed to possess. We do not know whether questions based thereon would have even been admissible. And, Cohen himself admitted that the information might not even be confidential at all; he stated, "[P]erhaps, another lawyer might have obtained the same information." Tr. 1069. Thus, we conclude that the mere fact that counsel was in possession of some confidential information about Berry did not necessarily preclude the possibility of an effective cross-examination.

On the basis of the record before the district court, Cohen did not demonstrate the existence of a conflict of interests, and his motions to withdraw and for a mistrial were appropriately denied. Thus, the court correctly instructed Cohen to conduct a complete cross-examination of the witness.

### III.

Even though the district court correctly found no conflict of interests and ordered Cohen to conduct a full cross-examination, he did not do so. Cohen misjudged his ethical responsibilities, but the fact remains that an important witness was not thoroughly cross-examined. Arguably, therefore, his client's constitutional right to the effective assistance of counsel was violated when he declined to heed the court's directive to conduct a full cross-examination notwithstanding his partner's former relationship with Berry.

■ We are persuaded, however, that the defendants waived their right to have Berry subjected to further cross-examination. Although Cohen stated that ethical considerations inhibited his ability to interrogate the witness thoroughly, or

his willingness to permit another member of his firm to do so, there is nothing in the record suggesting any reason why he could not have made an offer to have some other lawyer retained for this limited purpose, or why he could not make an appropriate record demonstrating that further cross-examination would have been beneficial to his clients. He made no motion for a continuance to obtain additional counsel; nor did he ask the court to order the witness to remain available for a delayed cross-examination after new counsel had been obtained. He made no offer of proof to indicate the nature of any favorable matter that might have been obtained by way of cross-examination. He did not even represent to the court that he had information, confidential or otherwise, which was inconsistent with any portion of Berry's direct testimony.

There is no reason to assume that in a matter of a few days a new lawyer could not have prepared an adequate and thorough cross-examination of Berry. Even if Cohen and his partner felt some inhibition about describing Berry's history to a new lawyer, certainly their clients, the leading members of the Family, were under no such restraint. Nor can we assume, without support in the record, that the confidential information was actually admissible, or even if admissible, was not merely cumulative of adverse matter already brought out on direct examination. If, for example, Cohen knew of additional criminal activity by Berry, such activity would hardly have affected his credibility any more than his admitted trafficking in heroin and participation in armed robberies; similarly, evidence of additional friction between Berry and members of the Family would have added little to the vindictive motivation naturally following from the fact, brought out on both direct and cross-examination, that defendant Jeffers had shot Berry.

■ Since we can only speculate as to the character or the importance of the underlying confidential information, we must decide where the burden of demon-

strating its materiality lies. Quite clearly, that burden rests with the defendants. And even if Cohen's ethical concerns led him to disregard the court order to cross-examine Berry, those concerns provided no excuse for a subsequent continuing failure to demonstrate that his information was material or for his failure to take steps to cause Berry to be effectively cross-examined by another lawyer if he felt that his clients' interests would have been served by such a cross-examination. Since each of the relevant rulings the trial judge was called upon to make was correct, we find no error resulting from Cohen's decision to abort the cross-examination of Berry prematurely. If the substantial rights of the defendants were affected by that decision, we are confident that a lawyer of Cohen's competence and dedication would have caused the record to so demonstrate unambiguously. By not asking any further questions, by making no offer of proof or other representation about the substance of his possible cross-examination of Berry, and by making no effort to have Berry cross-examined by other counsel, Cohen, on behalf of his clients, waived any additional cross-examination of this witness. On this record his statement at the conclusion of the colloquy with the court: "I have no further cross-examination, Your Honor," is conclusive even though he may have made that statement for an incorrect reason.

## IV.

Defendants next argue that the district court erred in denying motions to suppress with respect to certain items of physical evidence and the written and oral statements of Garland Jeffers.

### A.

Three notebooks, containing minutes of meetings of the Family, a list of members, the Family oath, and extensive notations as to dissemination and distribution of illegal drugs were taken from the purse of defendant Willis on March 8, 1972.

The district court found that on March 8, at approximately 3:00 a. m., gunfire erupted outside of the Gary Police Station. The officers who rushed outside arrested three men and brought them inside. Sometime later, Willis entered the station seeking her purse, which she claimed she had dropped when the shooting started. Sergeant Hjerpe then searched the purse for weapons and requested that Willis remove her calf-length boots. He peered inside each boot and probed it with his hand. Inside one of the boots the sergeant found a capsule, possibly containing a narcotic drug. At this point Willis was placed under arrest and the sergeant conducted a thorough search of the purse for other narcotics. In so doing, he once again noticed and more closely examined the notebooks in question. On the basis of these facts, the district court found that the search of the purse and the subsequent seizure of the notebooks were lawful.

■■■ The district court concluded, and we agree, that the initial search of Willis' purse and boots for weapons was justified, under the test set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917. An unexplained shootout had just occurred near the station house. Willis apparently had information concerning the incident. Consequently, it was most appropriate for the sergeant to question her about her involvement. While questioning her, the officer clearly had reason, based on the events of that night, to look out for his personal safety. Thus, he was permitted to take reasonable steps to determine whether Willis was armed. As the Court said in *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881:

> [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investi-

gating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Thus, Sergeant Hjerpe, was justified in conducting a search of the purse, which was, the district court found, in close proximity to Willis, and of her person, "limited to that which [was] necessary for the discovery of weapons." 392 U.S. at 26, 88 S.Ct. at 1882. There is no evidence that the search of Willis' boot exceeded this limitation.[16]

Once it is established that the initial search of Willis' boot was constitutionally permissible, it is clear that the discovery of a quantity of suspected narcotics gave the police probable cause to place her under arrest. And, the resulting second search of her purse and the seizure of her notebooks was properly incident to that arrest. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427; *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456; *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Accordingly, the district court did not err in denying the motion to suppress.[17]

### B.

Defendant Garland Jeffers gave two agents of the Bureau of Narcotics and Dangerous Drugs a written statement on March 14, 1972, while he was in custody in the Lake County Jail for parole violation. Among other things, the statement identified the books and records taken from Willis as "belonging to the family."

Jeffers objected to the admission of the statement on the grounds that the agents failed to give him the necessary warnings with respect to his constitutional rights, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The district court found, however, that such warnings had been given, and we do not find this factual conclusion "clearly erroneous." Similarly, Jeffers has not convinced us that the judge's finding that the statement was given voluntarily must be overturned.[18] Thus, the motion was properly denied.

### C.

Jeffers also moved to suppress an oral statement made by him on October 12, 1973, to a special agent of the Drug Enforcement Administration in the Hammond, Indiana, Federal Building. The district court found that Jeffers had voluntarily approached the agent with the information. Consequently, Jeffers was not in "custody" and there was no requirement that he be given *Miranda* warnings. We have previously indicated that our decision in *United States v. Dickerson,* 413 F.2d 1111 (7th Cir. 1969), with respect to the necessity of *Miranda* warnings in certain income tax investigations, is not to be read as adopting generally the approach that such warnings are necessary whenever an investigation focuses on a suspect. *United States v. Sicilia,* 475 F.2d 308, 310 (7th Cir. 1973), *cert. denied,* 414 U.S. 865, 94 S.Ct. 123, 38 L.Ed.2d 117. *See United States v. Oliver,* 505 F.2d 301, 305–306 (7th Cir. 1974). Nor do we think the district court erred when it concluded that, under the circumstances presented here, there was no risk of Jef-

---

**16.** The record does not demonstrate that he could have adequately determined that the boot did not contain a knife, for example, by any means other than by inserting his hand therein.

**17.** In any event, it is clear that only Willis would have standing to complain of this alleged Fourth Amendment violation. Thus, only her conviction could be affected by a con-

clusion that the search and seizure were impermissible. *Mabra v. Gray,* 518 F.2d 512 (7th Cir., 1975).

**18.** It is also apparent from the district court's decision on the motion to suppress that it did not credit Jeffers' testimony that he informed the agents at the inception of the interview that he wanted to speak to his lawyer.

fers being misled as to the nature of his conversation with the agent.[19]

## D.

Finally, Jeffers complains of the introduction of a second oral statement he made to the same special agent on or about December 14, 1973, in the basement of the Hammond Federal Building. Jeffers had been summoned to the building by the agent to discuss corrupt Gary police officers. The district court found that *Miranda* warnings were given at the inception of the conversation, and that the statements were voluntary. The record does not support Jeffers' contention that the government used deception or fraud to obtain admissions from him. He was fully informed, the trial judge found, that anything he said could be used against him. Consequently, the statements were appropriately admitted into evidence.

## V.

Finally, defendant Warner Smith, also known as "Tojo," argues that the evidence of his involvement in the conspiracy was insufficient to permit his conviction. Viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government, as we must, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, we affirm the conviction.

The most damning evidence against Smith was provided by government witness Kathleen Perry. She testified that in February, 1973, she traveled with her husband, Arthur Odell Buchanan, from Los Angeles to Hammond, Indiana. She stated that the purpose of the trip was to see Tojo. They brought with them two kilos of heroin and a half kilo of cocaine. Upon arriving in Indiana,

they went to a motel where a man named Glass picked them up. Glass took Perry and her husband to a corner drug store where they ate and waited for a man named Dee to arrive. Dee then drove them all to his house, located near Tojo's. They had stopped at Tojo's house, but did not find him at home.

Present in Dee's apartment were Perry, her husband Arthur, Glass, Dee, and Dee's wife. Dee began making phone calls, attempting to locate Peterman, the alias for Garland Jeffers. While Dee was on the phone, Tojo arrived, apparently in response to the message that Dee had left at Tojo's residence. Dee informed Tojo that he was unable to contact Peterman, and Tojo gave Dee a phone number where Peterman could be found. In the presence of Perry and Tojo, Dee described the quality of the drugs to Peterman.

After the phone call, everyone returned to Perry's motel room. At the motel, Arthur gave Mrs. Dee and Tojo some cocaine which each "snorted." Dee and Arthur went into the bathroom and shot some heroin. Subsequently, Dee called Peterman in Tojo's presence and reported to him that the heroin was good quality. Dee and Tojo then left together.

About 35 to 40 minutes later, Dee and Tojo returned; Dee and Arthur went back into the bathroom, and when they emerged, Perry testified that Dee had given Arthur $14,000 in exchange for one-half kilo of heroin.

Smith argues that Perry's testimony establishes only the fact that he provided Dee with Garland Jeffers' phone number and, at most, that he had knowledge of the sale of the heroin. Mere knowledge, presence, or association with conspirators, he notes, does not establish the ac-

**19.** Contrary to Jeffers' contentions, neither *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, nor *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, requires that a government agent consult first with counsel for an individual who comes forward voluntarily with information that could possibly be incriminating. Jeffers did not at any time request that he be able to consult with his lawyer, as did Spano; nor was he, while under indictment, the victim of a covert interrogation by way of a bugged informant, as was Massiah.

tive participation necessary to prove membership in a conspiracy.[20]

While we agree with Smith's statement of the applicable legal principles, we disagree with their application to the facts of this case. Perry's testimony indicated that defendant Smith, alias Tojo, was the contact point in the sale of heroin brought by Perry and her husband from California for sale to the Family. It was Tojo they had come to see. Tojo provided Dee with the phone number to contact Garland Jeffers. Tojo was present in Dee's apartment when Dee described the quality of the narcotics to Jeffers. He personally sampled some of the cocaine. He was present when Dee phoned Jeffers from the motel about the quality of the heroin. He and Dee then left, returned, and the sale was consummated between Dee and Arthur. It is surely a reasonable inference that the two of them left at the direction of Garland Jeffers to obtain the $14,000 with which the heroin was purchased. Thus, we do not agree that the evidence discloses that Smith was merely innocently present during all these occurrences. In facilitating the contacting of Jeffers and in going with Dee to obtain the money he took an active part in furthering the purposes of the conspiracy.[21]

In addition, while possibly not sufficient in and of itself, there is additional cumulative evidence of Tojo's involvement in the conspiracy. When Garland Jeffers was arrested by federal agents, for example, he asked who else was going to be arrested that day. The federal agent responded, "Everybody in The Family." Jeffers then said, "You mean, Ike, Doug, *Tojo* and everybody?" Tr. 1119–1120 (emphasis added).

When all of this evidence is considered in the light most favorable to the government, Warner Smith's conviction must be affirmed.

Accordingly the judgment entered by the district court is, in all respects,

Affirmed.

---

**20.** *United States v. Baker,* 499 F.2d 845 (7th Cir. 1974); *Bailey v. United States,* 135 U.S. App.D.C. 95, 416 F.2d 1110 (1969); *United States v. Stromberg,* 268 F.2d 256, 267 (2d Cir. 1959), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102.

**21.** The evidence against Smith in this case is significantly stronger than the evidence against Vela in *United States v. Baker,* 499 F.2d 845 (7th Cir. 1974). Vela was present in his own apartment while a discussion concerning the purchase of drugs was taking place. There was no evidence that Vela participated in this discussion. Nor was there any evidence that Vela participated in a similar conversation the next evening. Finally, while the evidence showed that Vela drove defendant Felts and another individual to a motel where the sale of some "reds" was consummated, there was no evidence that Vela participated in either the conversation or the transaction. A panel of this court (one judge dissenting) held that there was insufficient evidence to establish that Vela had knowledge of the criminal conspiracy or intended to participate in it.

Tojo, on the other hand, was actively involved in the conversations surrounding the sale of these drugs. He sampled the cocaine. He provided Dee with Garland Jeffers' phone number. He was present when the quality of the goods was described to Jeffers. And, he went with Dee to obtain the $14,000. Significantly, he was described by Perry as the one whom they had come from California to see. The fact that a stop was made at Tojo's house on the way to Dee's supports this conclusion.