**Magnolia ROSS, Petitioner,**

v.

**Robert P. HEYNE, Theodore Sendak, Respondents.**

**No. S 79–127.**

United States District Court,
N. D. Indiana,
South Bend Division.

Feb. 7, 1980.

David Capp, Merrillville, Ind., for petitioner.

Theodore L. Sendak, Atty. Gen. of Indiana by David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for respondents.

## MEMORANDUM OPINION AND ORDER

ALLEN SHARP, District Judge.

This Court now considers petitioner's request for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Magnolia Ross bases her petition on two grounds contending in both a violation of due process. For the reasons stated below, this Court finds the petitioner was denied the fundamental due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and that her petition for a writ of habeas corpus must be granted.

Petitioner Magnolia Ross and five others, Robert S. Spencer, Floyd Fayson, Leroy Hemphill, Edward Gillespie and Beatrice Ivy, were charged by information in the Lake Superior Court, Crown Point, Indiana, on November 20, 1968, with Inflicting Injury in Perpetration of Robbery and with Robbery. These charges stemmed from an assault and robbery of Father Peter Bankerovich on November 14, 1968 in Gary, Indiana. Father Bankerovich was robbed by a group of assailants, none of which he could identify at trial. During the robbery he was severely beaten with a baseball bat[1] and left partially paralyzed. The assailants made off with two dollars the priest carried with him at the time. Defendants Fayson, Gillespie and Spencer pleaded guilty to the robbery count and the State dismissed the inflicting charge. Each of them was sentenced to ten (10) to twenty-five (25) years imprisonment which was eventually corrected to a fixed term of ten (10) years. Defendant Hemphill pleaded guilty to an amended count of robbery while armed and was sentenced to ten (10) years imprisonment. No charges were ever brought against defendant Ivy.

Ross, the petitioner in the instant case, was the only defendant of the six to go to trial. She was convicted by a jury on both counts and was sentenced to life imprisonment on the inflicting count and ten (10) to twenty-five (25) years imprisonment on the robbery count. In considering petitioner's claim, this Court has carefully examined the entire state court record. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d

---

1. Record of transcript at pp. 200 and 201. Testimony of Dr. Robert Milos, the victim's treating physician.

770 (1963). Petitioner's conviction was affirmed on appeal to the Supreme Court of Indiana in *Ross v. State*, Ind., 377 N.E.2d 634 (1978).

At trial, the prosecution rested a major portion of its case upon the testimony of its chief witness, Robert Spencer, an admitted participant in the crime, who had agreed to testify for the state in return for its dismissing the inflicting count.[2] Spencer testified to Ross' participation in both the robbery and the beating stating he observed Ross strike the victim with the bat at least once.

On direct examination, the prosecutor asked no questions concerning the plea agreement. Upon cross-examination, counsel for the defendant petitioner asked Spencer one question as to whether he had been promised any "consideration" for his testimony. Spencer replied in the negative.[3] During redirect, the prosecutor remained silent as to the existence of a plea agreement.

From a reading of the transcript of the evidentiary hearing, conducted pursuant to Indiana Post-Conviction Rules 2 and 1, § 5, it is abundantly clear that a plea agreement had been reached between the witness Spencer and the State. Moreover, it is clear the prosecution informed the counsel for defendant-petitioner of the agreement[4]. Spencer had been informed of the offer from the State for his testimony by his attorney, who was also present at trial during the perjured testimony[5]. Except for

2. Exactly when Spencer pleaded guilty is not clear from the record. Spencer's defense counsel stated a week to ten days prior to trial, his client entered into the plea agreement with the state. Record of transcript p. 506. Petitioner's counsel at the Post-Conviction Evidentiary Hearing, however, stated the record reflected the agreement was made after petitioner's trial. Record of transcript p. 502.

3. Record of Transcript pp. 176–177.
 On cross-examination of Spencer, the following transpired:
 "Q. (By Mr. Kimbrough) and you admitted you inflicted the injury in perpetration of this robbery?
 A. Yes, sir.
 Q. Were you promised any kind of consideration if you testified?
 A. No.
 Q. You were not?
 A. No sir."

4. Upon being asked whether he informed the defendant's counsel of the plea agreement, the prosecutor stated:
 "A. I can remember that Judge Kimbrough then Mr. Kimbrough and I talked shortly before the trial and I think I said something to the effect of everybody else is pleading and we would give your client the same consideration, 10 to 25 for the robbery and as I recall he shrugged his shoulders, she won't plead guilty to anything." Record, p. 407.
 Petitioner's counsel at trial answered the following questions concerning his awareness of the plea agreement with the witness Spencer:
 "Q. Did you know prior to trial that Mr. Spencer would be the only witness to testify that Miss Ross hit the priest?
 A. I think that I was aware of that, Miss Ross had indicated that she did not and I had no reason to believe that she was not telling

me the truth. So that no one else might have known and as a result of conversations with Mr. Work I knew that he, that was going to be the nature of Mr. Spencer's testimony, yes.
 Q. Did you not depose Mr. Spencer?
 A. I did not depose Mr. Spencer.
 Q. Did you know that he would be a State's witness?
 A. I was aware of that prior to trial, yes.
 Q. Were you aware of any arrangements Mr. Spencer or Mr. Work had made with the prosecutor's office for leniency in exchange for Mr. Spencer's testimony?
 A. Yes.
 Q. How were you aware of this?
 A. I think primarily through Mr. Work. I may have discussed it also with Mr. Stanton, but I was privi (sic) to all what was happening to Mr. Spencer through Mr. Work.
 Q. Was Mr. Stanton correct when he testified earlier that he had told you prior to trial that all of the defendants would plead?
 A. I don't know that, I don't recall the specific conversation but I was aware that he were the only ones going to trial, yes.
 Q. In other words you were aware prior to the trial that Mr. Spencer after the trial was going to plead guilty to the robbery charge?
 A. Yes.
 Q. That the inflicting charge would be dropped?
 A. Yes.
 Q. You got this information through Mr. Work and possibly Mr. Stanton?
 A. Yes."
 Record pp. 484–485.

5. Spencer's attorney answered the following questions at the Post-Conviction Hearing:
 "Q. No. Do you recall whether or not you or Mr. Spencer engaged in discussions with the

the single question referred to above, no mention was made of the plea agreement and no effort was undertaken by the prosecutor, Ross' counsel or Spencer's counsel to correct the perjured testimony. Because of this failure, petitioner now contends, 12 years later, that her conviction was obtained through the use of knowingly false testimony and, as such, it was a violation of her due process rights.

## I.

The Court is faced with something more than a withholding of evidence problem, as found in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It must be determined whether the obvious duty of the prosecutor under *Napue* and *Giglio*, to inform the jury of any evidence that would affect the credibility of the witness, extends to a case where defense counsel was aware, well in advance of trial, of the existence of such evidence but refused to use it. Where defense counsel, in a knowing and intelligent decision on trial strategy, refuses to exploit a witness' perjured testimony, does due process require the prosecution to do so? In other words, does the duty of the prosecutor to inform the jury of the existence of a plea agreement require him to encroach upon a defendant's strategic and knowing choice not to offer evidence of the agreement? To these last two inquiries, this Court must answer yes.

It is well settled that deliberate deception of a court and jurors by the presentation of known false evidence cannot be reconciled with the rudimentary demands of justice. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, supra, 360 U.S. at 269, 79 S.Ct. at 1177 (1959). This principal applies even where the evidence would only affect the credibility of the witness since "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." 360 U.S. at 269, 79 S.Ct. at 1177.

In *Napue* an accomplice testified that he had received no promise in return for his testimony against the defendant. The prosecutor knew favorable consideration was promised to the witness but did nothing to correct the witness' false testimony. The Supreme Court of the United States held that a failure of the prosecutor to correct the knowingly false testimony of the witness was a violation of defendant's due process rights. The defendant in *Napue* was unaware until after his conviction that any plea agreement had been discussed. In *Giglio*, the Supreme Court again held that the prosecutor's failure to present all material evidence to the jury constituted a denial of due process which required a new trial. In *Giglio* as in *Napue*, however, the defendant was not aware of the fact a plea agreement was made until after conviction. Such is not the case here.

Were this a case of the prosecutor withholding evidence from the jury and the defendant, this Court would not hesitate in

Prosecuting Attorney or a representative of the Prosecuting Attorney regarding Mr. Spencer's anticipated testimony for the State?
A. Yes.
Q. And do you recall with whom you engaged in such discussions?
A. I don't recall specifically. I would imagine that the conversation took place between myself and the then chief deputy prosecutor, Ray Sufana.
Q. And what was the substance of that discussion?
A. That Mr. Spencer would plead guilty if the State saw fit to accept his plea to the charge of robbery, that he would be expected to testify as a witness for the State.
Q. And was there then an understanding that if he did testify for the State, then he would not be tried on the charge of inflicting injury?
A. That was my understanding, yes.
Q. That was an understanding conveyed by Mr. Sufana?
A. By whomever I talked to representing the Prosecutor's office as I said.
Q. Now, did you convey this agreement to your client, Mr. Spencer before he testified?
A. I am certain that I would have, yes."
Record pp. 502–503.

its granting of the writ. However, where defense counsel, with the knowledge of a plea agreement, chooses not to exploit the perjury of a state's witness for strategic purposes, the mandate of the *Giglio* and *Napue* appears less than clear. Courts of Appeals have examined the issue in a factual context similar to the one at bar and have not appeared unequivocal in ordering a reversal. In *United States v. Decker*, 543 F.2d 1102 (5th Cir. 1976), the court held that the Government fulfilled its duty of disclosure by supplying defendants with its recollection of the true circumstances of certain plea negotiations of a witness at a time when recall and further exploration by defense counsel was possible. The court did, however, emphasize in *Decker* that its decision rested in part upon the fact the jury was fully informed of the existing plea agreement. 543 F.2d at 1105. In *Decker*, the Government's witnesses incorrectly stated the circumstances surrounding their plea agreement. Upon recollection of the true factual setting of the agreement, the Assistant United States Attorney provided defendants with the correct information in time to use it at trial. See also, *United States v. Alonzo*, 571 F.2d 1384 at 1386 (5th Cir. 1978) (related case).

Similarly, the Fifth Circuit Court of Appeals in a footnote expressed hesitation in overturning a conviction on grounds that the prosecutor failed to correct false evidence if defense counsel knew the evidence was false and simply allowed it to go uncorrected. *United States v. Barham*, 595 F.2d 231, 243 n. 17 (5th Cir. 1979). The *Barham* court did in fact reverse the convictions relying on *Giglio* and *United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977), emphasizing the intentional misleading questions of the prosecutor on redirect compounded the deception of the testimony upon the court.

▮ In this case, the prosecutor had informed the defendant, through her counsel well in advance of trial, the fact that

Spencer had made a plea agreement and would testify for the State. Neither the prosecutor nor the defense counsel exploited the fact of the perjury. This factor distinguishes the case at bar from *Napue, Giglio* and their progeny and lends some merit to the argument that defense counsel's failure to pursue the obvious perjured testimony was a knowing and intelligent decision of trial strategy and, as such, a waiver of any due process violation. This argument poses the question whether a defendant can have it both ways at trial, withholding evidence of perjury gambling on acquittal without presenting it, and then later, after the gambit fails, present such withheld evidence at a subsequent proceeding under 28 U.S.C. § 2254. Other courts have not been sympathetic to this tactic and have refused to consider a due process violation filed by a convicted defendant where he made the conscious choice to conceal evidence of perjury at trial. *Jacobanis v. United States*, 256 F.2d 485 (1st Cir. 1958).

Although this "waiver theory" has some arguable validity, this Court cannot ignore the clear holdings in *Napue* and *Giglio*. Where the prosecutor's case depends substantially upon the testimony of the perjured witness, the credibility of that witness is an important issue and "evidence of any undertaking or agreement as to a future prosecution would be relevant to his credibility and the jury . . . [is] entitled to know of it." *Giglio*, 405 U.S. at 154–155, 92 S.Ct. at 766.

An examination of the state record makes it initially apparent that petitioner's conviction could not have been obtained without the testimony of Spencer. Spencer was the only witness to testify that petitioner struck the victim with the bat. Thus, the one necessary element for obtaining a conviction on the inflicting charge was provided solely by this witness. Secondly, there is no doubt that the witness, as well as the defendant-petitioner's counsel[6], knew of the plea agreement. It is

---

**6.** Although the State Court found that since no written plea agreement was entered, there was no bargain made for Spencer's testimony, this

Court finds otherwise. It is apparent from the record of the Post-Conviction Hearing that Spencer was made aware of the plea offer from

also doubtless that the false testimony concerning the plea agreement could have reasonably affected the judgment of the jury. Thus, the two part test of *Giglio* has been met in this case. See, *United States v. Bynum*, 567 F.2d 1167 (1st Cir. 1978).

The jury was entitled to know of the plea agreement in this case. Keeping information from the jury that would prove the existence of the agreement was a violation of due process. The prosecutor had the duty to present such information to the jury. Moreover, that duty is not met by informing only the defendant and counsel of the agreement. Despite the defendant's tactical maneuvering with the perjuring witness, the prosecutor must inform the jury of the plea agreement. By remaining silent, the prosecutor ignores his duty under the due process clause of the Fourteenth Amendment.

This Court is less than comfortable with the result announced here. If the reasoning and result of *Evans v. U. S.*, 408 F.2d 369 (7th Cir. 1969), were still in full force and effect it would be relatively easy to deny this writ. *Evans* must now be reexamined in light of *Giglio*.

There can be little doubt that *Giglio* was based on constitutional due process consideration that would apply to state court criminal proceedings. Therefore, we do not have here the federalism concerns which this Court expressed in *Ortiz v. Duckworth*, 482 F.Supp. 1083 (N.D.Ind. 1980).

The question is whether the holding in *Evans* has been undermined by the ruling in *Giglio*. While experienced opinion readers may differ on the subject, this one believes and here holds that *Giglio* established an overriding prosecutorial burden of that requires the correction of known false testimony even under the circumstances of this case [7]. The linchpin established by the Chief Justice in *Giglio* is the jury's right to know of any agreement between witness and prosecuting authority. Such was absent in *Giglio* and caused reversal of conviction. Such is absent here and causes the granting of this writ.

## II.

The appointment of one defense counsel to represent more than one defendant charged in the same criminal case would *now* represent a poor exercise of judgment under the teaching of *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Such joint representation poses potential constitutional problems as indicated in *U. S. v. Mandell*, 525 F.2d 671 (7th Cir. 1975), and *U. S. v. Gaines*, 529 F.2d 1038 (7th Cir. 1976). See also, *U. S. v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975). For a recent and very complete analysis of the

---

the State through his attorney. The following are excerpts from that hearing which leads this Court to believe the witness was indeed aware of the plea agreement:

> "Q. [Mr] Work, would it have been your practice to allow your client to testify at trial and thereby implicate himself without having some agreement with the Prosecutor's office as to disposition of his case?
> A. No, that would not have been my practice and that is the reason that I am confused with the record. I don't, I cannot imagine my having not consummated the terms of the plea bargaining prior to his testifying."
> 
> \* \* \* \* \* \*
> 
> "Q. Did you convey that, do you remember, to your client, Mr. Spencer?
> A. Yes.
> Q. You are sure of that?
> A. I am certain of that."
> 
> \* \* \* \* \* \*
> 
> "BY THE COURT:

Q. Was that the case here? Do you have any independent knowledge?
A. I am certain that there was, I am certain that there was a plea agreement in lieu of his testimony. He would not have been prosecuted on the charge carrying life in prison.
Q. Was that an agreement between you and the prosecution, Mr. Sufana, or was it first of all, that is the first question?
A. That was the agreement between the prosecutor's office and I am assuming that it was Mr. Sufana and myself."
Record pp. 507–509.

7. The closeness of this question is emphasized by the analysis of Justice Prentice speaking for the Supreme Court of Indiana at 377 N.E.2d 636 which correctly discusses *Napue* but does not cite or discuss *Giglio*. While this Court has great respect for the highest court of Indiana and its members, it must respectfully disagree with its reading of the teaching of *Napue* and *Giglio*.

subject see *U. S. v. Mavrick*, 601 F.2d 921 (7th Cir. 1979). For application of these ideas in the context of a federal habeas corpus under 28 U.S.C. § 2254 see *U. S. ex rel. McLindon v. Warden*, 575 F.2d 108 (7th Cir. 1978).

In fairness, the state criminal trial judge was not obligated to predict this bit of constitutional wisdom in 1968 when the appointments of counsel were made for this plaintiff and her then co-defendants. Neither were the then appointed counsel bound to know how constitutionally sensitive the problem of joint representation of co-defendants in the same case would become. No criticism is here intended of either the appointing judge or appointed counsel.

There is another aspect that factually distinguishes this case from the likes of *Holloway, Gaines* and *Mandell*. In each of those cases more than one defendant actually went to trial represented by a single defense counsel. In this case Ross went to trial *alone*. Thus, this record does not reflect that counsel who represented Ross in a single trial where she was on trial alone was in any way inhibited in effectively meeting Sixth Amendment responsibilities. Ross has wholly failed to demonstrate even arguable ineffectiveness of counsel at her state criminal trial.

The most that can be said is that trial counsel for Ross had a potential problem in cross-examining a witness who was being represented by his law partner. The situation in this regard is well described by Judge, now Mr. Justice Stevens in *U. S. v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), in Parts II and III thereof, pps. 1262–1267.

The record here does not even come close to suggesting that the Sixth Amendment rights to effective counsel was in any way impaired and Ross has totally failed to demonstrate same.

While the writ is being granted on other grounds, it cannot be and is not being granted on the basis of ineffective counsel.

### III.

It is therefore the ruling of this Court that the State denied Ross due process of law in violation of the Fourteenth Amendment. The writ of habeas corpus will now issue unless, within a reasonable time, the State should elect to retry Ross.