UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred MANDELL et al.,
Defendants-Appellants.

No. 75–1111.

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1975.

Decided July 30, 1975.

Rehearing Denied Aug. 25, 1975.

Certiorari Denied Jan. 12, 1976.
See 96 S.Ct. 774.

Julius Lucius Echeles, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gary L. Starkman, Steven J. Kadison, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* STEVENS, Circuit Judge, and GRANT, Senior District Judge.**

PER CURIAM.

Defendants Fred and Enid Mandell and Ernest Fairchild appeal from their convictions on a three-count indictment charging them with wire and mail fraud and transportation of property obtained by fraud in interstate commerce.[1] All three of the defendants allege that they were denied effective assistance of counsel because they were represented by the same attorney at trial. They also complain of the limitations placed on their cross-examination of the chief government witnesses, Harold Kriv and Ira Leon, and of the fact that the prosecutor was permitted to confer with Kriv continually during his testimony. Finally, Fred Mandell asserts as reversible error the fact that the government elicited testimony concerning Mandell's assertion of his right to remain silent upon his arrest.

As we find that none of these alleged errors requires reversal, we affirm the convictions entered below.

In ruling on the defendants' motions for judgments of acquittal or, in the alternative, a new trial, the district court

---

* Associate Justice Tom C. Clark (Retired) of the Supreme Court of the United States is sitting by designation.

** Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

1. All three were found guilty by the jury of the mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) counts. Fred and Enid Mandell were found guilty on the interstate transportation count (18 U.S.C. § 2314). Fred Mandell was sentenced to a five-year term on each of the three counts, to run concurrently. Enid Mandell received a two-year concurrent sentence on each count, with provision for parole under 18 U.S.C. § 4208(a)(2). Ernest Fairchild was sentenced to a term of one year and one day on each of his two convictions, to run concurrently.

reviewed and summarized the evidence presented to the jury. We adopt his summary as our statement of facts:

There was overwhelming credible testimony which showed that Fred Mandell, an attorney, importuned first his office associate, Harold Kriv, and then a gambling acquaintance, Ira Leon, to invest in personal injury judgments which Mandell represented he had obtained against the City of Chicago in behalf of certain of his clients. Evidently Mandell had actually obtained two nominal judgments of $1,000 against the City. He took certified copies of those judgments, altered them by dismantling the certification and substituting spurious pages showing that each judgment was in the amount of $120,000. These he flashed to Kriv, a distressingly eager victim, and regrettably, also a member of the bar, telling Kriv that he could enjoy half of the judgments for an investment of $75,000 in cash. Kriv's $75,-000 was to have added to it $15,000 from Mandell, which was to be distributed $40,000 each to the two clients who had been persuaded by Mandell to sell their "judgments" for $40,000, and $10,000 to a state court judge who was to preside over the bilking of Mandell's clients.

According to Mandell, the $240,000 in judgments would be "discounted" with a judgment broker in Waukegan, Illinois who would pay within a matter of days $211,000. This would be divided between Mandell and Kriv 50–50 after the repayment to Kriv of his $75,000 investment and another $12,-500 which he had invested with Mandell in regard to certain personal injury cases in which Mandell had contingent fee contracts.

Kriv came up with his $75,000 with amazing alacrity. One of the ingredients of the scheme was the need for speed, cash and no writing. Kriv went from bank to bank cleaning out his accounts and one belonging to his wife and gave Mandell the $75,000 in $100 bills and that was the last he ever saw of it.

The scheme was hopeless. There were no judgments that could be turned into $211,000 and Mandell needed some explanation for the whereabouts of Kriv's money when Mandell couldn't produce. Either fortuitously or as a part of the scheme, an explanation presented itself when Kriv was shot in his office of a Saturday afternoon by a black man who came to the office posing as a prospective client. Kriv was hospitalized and underwent major surgery. His wife was then involved by Mandell, Mandell's wife, Enid, and Ernest Fairchild who told Mrs. Kriv that her husband had been shot by irate blacks whom he had been cheating; that a black gang was out to get Kriv, Mrs. Kriv, their children, the Mandells and their children unless the $75,000 could be used to pay them off. She gave her consent ignorant of the transaction in which her husband had engaged with Mandell. Thereafter Kriv and his wife were pressured into contributing yet another $58,000 to the non-existent black gang, a portion of which was raised by a telephone call to Kriv's father in Iowa, and his mailing of a $15,000 check to Kriv in Chicago, hence the wire and mail involvements in the scheme, and that money was never seen again, after it was delivered to the two Mandells and Fairchild for payment to the black gang.

The Mandells represented to the Krivs that Enid had contributed $23,-000 to the final payoff. This was another fiction. Following a disagreement some months later, Enid demanded repayment of her money threatening Kriv to send the same "guy" to do it again, only this time "he'll complete the job."

Leon was the second victim. The scheme was the same although some of the techniques were a bit different. He was importuned to invest $65,000 in a similar quick discount of judg-

ments against the City. Mandell used the same names of clients, same judgment amounts, only this time he involved an unknown person who played the role of a lawyer for the City who flashed at Leon phony checks in large amounts which were to be Leon's and Mandell's for ready cashing in a few days. So generous was the man from the City that he offered a second check with a face value of $300,000 to Mandell and Leon if they could come up with an additional $75,000. Mandell "contributed" $17,000 and Leon parted with another $58,000. Leon has yet to see any of the total $123,000 he invested.

When Leon became insistent, he was told by Mandell that Mandell had become involved in an argument with the City lawyer, had killed him, that the laywer's body was in the trunk of a car driven by Fairchild, that Fairchild wanted $50,000 to dispose of the body in Colorado, and Mandell needed $50,000 to escape the country. At that point Leon suspected something was amiss. But he went through the motions of raising the money, timing it in such a way that the checks he obtained could not be converted to cash until the next business day (which was a Monday) and over the intervening weekend he contacted his lawyers who in turn contacted the Government who in turn arranged for the apprehension of Mandell, in whose possession was found the spurious checks and other incriminating documents.

Enid Mandell's role in the Leon fleecing was that of a courier and passer of messages between Leon and her husband. Fairchild participated directly in the portion of the scheme that involved a dead body in Fairchild's trunk, etc.

Clearly, as the indictment alleged, Mandell devised a scheme to defraud Leon and Kriv and Enid Mandell and Ernest Fairchild embraced it and aided and abetted in its perpetration. The scheme was successful. The mails and interstate wire were used and some of the proceeds were transported in interstate commerce, all as alleged in the indictment.

I.

■ All three defendants contend that they were prejudiced by their joint representation by a single retained trial counsel, Julius Sherwin.[2] As we have recently noted, the Sixth Amendment guarantee of Assistance of Counsel,[3] requires representation by counsel whose loyalties lie exclusively with his client. *United States v. Jeffers*, 520 F.2d 1256 (7th Cir., 1975).

The potential conflict of interests that exists when multiple criminal defendants are represented by the same counsel has long been recognized by the courts. In *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680, where, over his objection, a defendant was represented by the counsel of his co-defendant, the Supreme Court explained:

[We are] clear that the "assistance of counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less

2. Actually, another attorney, Benjamin Daidone, entered an appearance on behalf of the Mandells and was present at counsel table throughout the trial. He did not, however, participate on the record although he may have been active in advising Sherwin. We will assume, however, for purposes of discussion, that only Sherwin represented these defendants.

3. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

than this, a valued constitutional safeguard is substantially impaired.

The danger of a conflict is so severe in such a situation that the American Bar Association has recommended that such dual representation be undertaken only in the extraordinary case:

> The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except· in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.

A.B.A. Standards: The Defense Function § 3.5(b) (1971).[4]

Defendants urge us, in view of these considerations, to follow the lead of the District of Columbia Circuit, which has placed the burden on the trial judge to determine at the outset of the criminal trial where multiple-defendant representation exists whether defendants are aware of the dangers present and whether they knowingly and intelligently waived single representation. *See Lollar v. United States,* 126 U.S.App.D.C. 200, 376 F.2d 243, 245–246 (1967); *Campbell v. United States,* 122 U.S.App.D.C. 143, 352 F.2d 359, 360–361 (1965).[5] As the court explained in *Campbell*:

> An individual defendant is rarely sophisticated enough to evaluate the potential conflicts, and when two defendants appear with a single attorney it cannot be determined, absent inquiry by the trial judge, whether the attorney has made such an appraisal or has advised his clients of the risks. Considerations of efficient judicial administration as well as important rights of defendants are served when the trial judge makes the affirmative determination that co-defendants have intelligently chosen to be represented by the same attorney and that their decision was not governed by poverty and lack of information on the availability of assigned counsel.

352 F.2d at 360. In the D.C. Circuit, where the record does not affirmatively indicate that the defendants were so warned and that they waived any possible conflict, the burden shifts to the government to demonstrate beyond a reasonable doubt that a prejudicial conflict of interests did not exist.[6]

---

**4.** The Commentary to § 3.5(b) explains that the following dangers arise from multiple-client representation:

> "In many instances a given course of action may be advantageous to one of the defendants but not necessarily to the other. The prosecutor may be inclined to accept a guilty plea from one of the co-defendants, either to a lesser offense or with a lesser penalty or other considerations; but this might harm the interests of the other defendant. The contrast in the dispositions of their cases may have a harmful impact on the remaining defendant; the one who pleads guilty might even, as part of the plea agreement, consent to testify against the co-defendant. Moreover, the very fact of multiple representation makes it impossible to assure the accused that his statements to the lawyer are given in full confidence. Defense counsel necessarily must confront each with any conflicting statements made by the other in the course of planning the defense of the cases. In this situation he may find that

he must 'judge' his clients to determine which is telling the truth, and his role as advocate would inevitably be undermined as to one if not both defendants."
A.B.A. Standards: The Defense Function § 3.5(b) at 213–214 (1971).

**5.** It is not clear in these cases whether the court felt this duty of inquiry was compelled by the Sixth Amendment or whether it was merely a product of the court's supervisory powers.

**6.** In *Lollar* the court more fully explained the effects of a failure of the trial court to make such an affirmative determination:

> "We hold, therefore, that only where ' "we can find no basis in the record for an informed speculation" that appellant's rights were· prejudicially affected,' can the conviction stand. [Citations omitted]. In effect, we adopt the standard of 'reasonable doubt,' a standard the Supreme Court recently said must govern whenever the prosecution con-

Both the Third and the First Circuits have also indicated the desirability of the trial judge affirmatively inquiring of multiple defendants represented by a single defense counsel to determine whether they are cognizant of the risks of conflict of interests and whether, in the light of those risks, they still wish to maintain their common representation. *See United States ex rel. Hart v. Davenport,* 478 F.2d 203, 211 (3rd Cir. 1973); *United States v. Foster,* 469 F.2d 1, 5 (1st Cir. 1972).[7]

Other circuits have not adopted such a requirement, however: *see United States v. Boudreaux,* 502 F.2d 557, 558 (5th Cir. 1974);[8] *United States v. Christopher,* 488 F.2d 849, 851 (9th Cir. 1973); *United States v. Paz-Sierra,* 367 F.2d 930, 932–933 (2d Cir. 1966), *cert. denied,* 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed.2d 807; *cf. Fryar v. United States,* 404 F.2d 1071, 1073 (10th Cir. 1968), *cert. denied,* 395 U.S. 964, 89 S.Ct. 2109, 23 L.Ed.2d 751. They would not require the trial judge to act affirmatively to ascertain whether a conflict existed unless, in the words of *Boudreaux,* there was "objection, claim [or] notice to the court of any alleged conflict between the interests of the defendants." 502 F.2d at 558. The harshest criticism of any rule involving the trial judge in such an inquiry has come from the Second Circuit. In *Paz-Sierra,* 367 F.2d at 932–933, Judge Moore explained:

The ramifications of the situation in which the court in advance of trial arrogates to itself the function of determining whether the "co-defendants have intelligently chosen to be represented by the same attorney" are so great as to cause this Court to doubt the wisdom of adopting the proposition that an affirmative determination be made by the trial court that the defendant has "intelligently chosen to be represented by the same attorney." No facts have thus far been presented that the Bar of this country is so un-

---

tends the denial of a constitutional right is merely harmless error. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." 376 F.2d at 247.

Thus, the D.C. Circuit rule is not a *per se* rule requiring reversal when the trial judge fails to carry out his function, as stated in *United States v. Foster,* 469 F.2d 1, 5 (1st Cir. 1972), and *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 211 (3rd Cir. 1973), but it does place a heavy burden on the government to demonstrate that any potential conflict of interests was harmless to the appellant "beyond a reasonable doubt."

7. In *Foster,* the First Circuit indicated that, in requiring such an affirmative inquiry, it was acting under its supervisory powers. 469 F.2d at 4. It then explained the operation of the rule:

"If the court has carried out this duty of inquiry, then to the extent a defendant later attempts to attack his conviction on grounds of conflict of interest arising from joint representation he will bear a heavy burden indeed of persuading us that he was, for that reason, deprived of a fair trial.

"When a satisfactory inquiry does not appear on the record, the burden of persuasion will shift to the government. If the case comes before us on direct appeal, the government will be required to demonstrate

from the record that prejudice to the defendant was improbable. If the issue arises in the context of a § 2255 motion, the government will bear the burden of establishing the unlikelihood of prejudice by a preponderance of the evidence." *Id.* at 5.

Thus, the First Circuit rule, like that of the D.C. Circuit, operates to shift the burden of persuasion to the government in the absence of warnings and express waiver.

The Third Circuit, although it stated that a rule requiring affirmative judicial inquiry might be desirable, refused to adopt one in *Davenport,* 478 F.2d at 211. Instead, it found the conviction infirm in that case on the basis of prior Third Circuit case law:

"[W]e have held that upon a showing of a possible conflict of interest or prejudice, however remote, we will regard joint representation as constitutionally defective. *Walker v. United States,* 422 F.2d 374 (3d Cir.), *cert. denied,* 399 U.S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970)." *Id.* at 210.

8. *Boudreaux* states that the D.C. Circuit rule has been held to be unnecessary by "the majority of the Circuits." 502 F.2d at 558. Actually, however, only *Christopher, Paz-Sierra* and *Fryar,* cited in the text, discuss such a requirement. Thus, in the other cases cited by the Fifth Circuit the rejection of such a rule can, at most, have been *sub silentio.*

mindful of the canons of ethics and its obligation to avoid positions of conflict as to call for a pre-trial cross-examination of defendants and their counsel on the theory, or even presumptuous presumption, that counsel will not be faithful to the best interests of their clients and when aware of any conflict of interest between clients jointly represented whether before or during trial will not disclose it to the court and seek appropriate relief. Furthermore, should it appear that a defendant was in fact prejudiced by the sharing of counsel, he would be even more prejudiced in raising this point on appeal by the trial court's a priori finding that there was no prejudice likely to occur in proceeding with shared counsel. An appellate court could almost take judicial notice of the fact that in a joint representation situation, if one defendant were convicted and the other acquitted, appellate counsel would argue prejudice as to the convicted defendant. Hindsight being what it is, a wiser approach might well be to leave to the members of the Bar the avoidance of cases of apparent prejudice by their refusal to represent clients with conflicting interests.

■ We agree with Judge Moore that the primary responsibility for the ascertainment and avoidance of conflict situations must lie with the members of the bar.[9] This is especially true in the common representation situation, for all courts have recognized that common representation, without a showing of conflicting interests, is not in itself a violation of the Sixth Amendment, and that there may be excellent reasons for preferring the use of a single attorney in a particular case. We think the Sixth Amendment rights of defendants are adequately safeguarded by imposing the duty of informing defendants of the potential dangers of multiple-client representation initially on the attorneys, as officers of the court, and by admonishing the trial judges to be watchful for indicia of conflict during the trial. Thus, we do not feel the D.C. Circuit's affirmative inquiry requirement is mandated by the Sixth Amendment, *Glasser,* or any other Supreme Court pronouncement. And, at this time, we join the Third Circuit in declining to adopt such a rule based on our inherent supervisory authority.[10]

■ Having concluded that the district court did not err in failing to determine that the defendants were aware of the risks in having Sherwin represent all of them, we believe that it is incumbent upon the defendants to demonstrate, with a reasonable degree of specificity, that a conflict of interests actually existed at trial.[11]

■ Defendants Enid Mandell and Ernest Fairchild contend that a conflict existed because of the differing degrees of culpability that existed among the defendants and because Sherwin spent most of his time and efforts in an attempt to defend Fred Mandell. They make no allegations that there was any inconsistency in the defenses the three

---

**9.** A.B.A. Canon of Professional Ethics 6 requires an attorney to bring a possible conflict of interest to his client's attention at the earliest possible time. *See also Holland v. Henderson,* 460 F.2d 978, 981 (5th Cir. 1972). There is no evidence in the record and no representation by defendants in their briefs to this court that Sherwin did not comply with this requirement. The noteworthy absence of such an allegation in this case strengthens our conclusion that no purpose would be served in remanding this case to the district court for a hearing on the existence of a conflict of interest.

**10.** This is not to suggest that the adoption of such a practice by the district court judges within this circuit would not be desirable.

**11.** Thus, we do not shift the burden of persuasion to the government in such a circumstance. And, we do not adopt as low a standard of proof as that articulated by the Third Circuit in its decisions. *See* n. 7, *supra.* Thus, we require a defendant who has retained counsel in conjunction with codefendants to demonstrate something more than "a possible conflict of interest . . . however remote."

defendants did or could have put forth. Instead, they merely assert that they were forgotten by Sherwin in his attempt to acquit Fred Mandell.

The record does not support these contentions. Both Enid Mandell and Fairchild testified on their own behalf, were vigorously examined by Sherwin, and denied all of the allegations contained in the indictment. In his closing argument, Sherwin spent considerable time reviewing and highlighting their testimony.

Moreover, defense strategy in this case was a common one that applied consistently to all three defendants—that there was no scheme to defraud, that Harold Kriv fabricated his story after reading about the arrest of Fred Mandell in the newspapers, and that Ira Leon was covering up his embezzlement of company funds. Any added emphasis that Sherwin gave to Fred Mandell's participation in the scheme of necessity redounded to the benefit of the other defendants as well.

Thus, the record in this case does not disclose the complete ignoring of a less culpable defendant, in favor of his more deeply inculpated codefendant, by common counsel that existed in the cases of *United States v. Marshall,* 488 F.2d 1169, 1190-94 (9th Cir. 1973), and *Campbell v. United States,* 122 U.S.App.D.C. 143, 352 F.2d 359, 361 (1965), where convictions were reversed on Sixth Amendment grounds. If we were to find a Sixth Amendment violation on the basis of these defendants' argument, we would, in effect, have to find such a violation in any case where two defendants of unequal culpability are represented by the same counsel. The Sixth Amendment guarantee of Assistance of Counsel commands no such rule.[12]

■ Fred Mandell also complains of the conflict of interests, based on a statement made by Sherwin during closing argument.[13] We have read the statement in the context of Sherwin's argument and do not find it to constitute an admission against Fred Mandell. All that counsel was doing at that point was summarizing the allegations of the indictment. His reference to the fact that the rest of the indictment referred only to Fred Mandell was merely a continued summary and in no way prejudiced his client.[14]

Consequently, we reject defendants' conflict of interests arguments.

## II.

Defendants next complain of rulings of the trial judge which, they claim, limited their ability adequately to cross-examine government witnesses, Kriv, Leon, and Kruse to expose their possible inter-

---

12. In addition, at oral argument counsel for Enid Mandell and Fairchild requested that we "speculate" that any or all of the parade of horribles described in the Commentary to A.B.A. Standard: The Defense Function § 3.5(b), *supra* n. 4, may well have occurred with respect to these defendants. This we decline to do. There must be a showing of a conflict of interests based on the record and not on mere speculation. No such showing has been made in this case.

13. "In any event, that these people—now, here is what they are talking about—devised and intended to devise a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses, representations and promises, knowing them to be false—the scheme was in substance that. And from this point on every reference to the indictment is Fred Mandell—and I don't want Fred Mandell to think I'm deserting him and selling him down the river, because when I get through talking to you, there are going to be many reasonable doubts that I will point out to you as to why regardless of what else happened, they have not proven a case, not even by a preponderance of evidence, supporting the legal opinion given by Mr. Kruse at least as to Kriv when he heard his story."

14. In addition, all three defendants contend that a conflict of interests existed when Sherwin cross-examined Julia Maratto, defendant Fred Mandell's ex-secretary, after having represented her on a previous occasion. Applying the analysis contained in our recent decision in *United States v. Jeffers,* 520 F.2d 1256 (7th Cir., 1975), we find no such conflict.

ests, bias, and motives in testifying against the defendants.

■ With respect to Kriv, they contend that they were not permitted to develop fully the facts surrounding his participation in a conspiracy to bribe a state court judge, the reasons behind his dismissal of a civil suit against defendants Fred and Enid Mandell, and his violations of professional ethics. We have read the record references cited to us by defendants and are not persuaded that they in fact were not given an ample opportunity to explore each of these three areas. To the extent that the trial judge did place limits on the inquiry, we find that he acted well within his discretion to limit the scope and extent of cross-examination. *See United States v. Isaacs,* 493 F.2d 1124, 1162 (7th Cir. 1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146.

■ Similarly, we find no improper limitation on the scope of defendants' cross-examination of Leon with respect to a possible embezzlement of funds from his corporation. The only sustained government objection that was cited by defendants was to the improper defense question, "That was an illegal transaction, wasn't it?"

■ And we agree with the ruling of the trial judge that the amount of money Kriv paid Attorney Kruse in connection with a contemplated action against the Mandells for fraud was simply irrelevant. Clearly, however, even if error, the ruling was harmless.

### III.

■ During his direct examination of the government's first witness, Kriv, the prosecutor privately spoke to the witness while he was on the witness stand. He explained that such conversations were necessary because "Mr. Sherwin has raised some points in his opening that came as a complete surprise to me." Tr. 79. The trial judge held that such discussions were permissible but admon-

ished the prosecutor, "I don't think that he [Kriv] should discuss the testimony that he has already given." Tr. 78–79. Under the circumstances, we think it was within the discretion of the trial judge to permit such conference to take place, subject to the admonition, and we find no error, especially since the defendants did not object to such discussions at trial.

### IV.

Finally, defendant Fred Mandell argues that his right to a fair trial was severely prejudiced when the government presented evidence that he, when arrested, invoked his constitutional privilege to remain silent.

This court has consistently criticized prosecutorial conduct designed to elicit the fact that a defendant has so relied on his Fifth Amendment rights. *See United States v. Bridges,* 499 F.2d 179, 182–183 (7th Cir. 1974), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284; *United States v. Matos,* 444 F.2d 1071, 1072–1073 (7th Cir. 1971); *United States v. Kroslack,* 426 F.2d 1129, 1130–1131 (7th Cir. 1970); *see also Baker v. United States,* 357 F.2d 11 (5th Cir. 1966).

Agent Kogut, who arrested the defendant, testified as to the circumstances surrounding the arrest. He stated that the *Miranda* warnings were given to Mandell; then the agent was asked:

Q. And what, if anything, did he say?

A. Well, at this point Mr. Mandell told me that he was a practicing attorney, and he was very much aware of his rights; that he understood everything I was speaking to him about when it came to the rights that I explained.

* * * He told us once again he understood his rights, but he would rather not sign the form, and he would rather not discuss the case at this point.

Tr. 866.[15] No objection was made to this question; no motion to strike was made with respect to the answer; no request for a mistrial was tendered by defendant. At the conclusion of the witness' testimony and outside the presence of the jury, the trial judge brought the matter of the aforementioned response to the attention of counsel *sua sponte,* and suggested that an instruction should be given the jury to disregard the answer. The prosecutor stated that the reply had come as a surprise to him. When the jury returned, the court stated:

> The Court: Ladies and gentlemen, we are going to perform a little legal surgery, and I want you to pay close attention to what I am about to say to you.
>
> During the course of Agent Kogut's testimony, when he was testifying with respect to the arrest, he stated that Mr. Mandell said to him that he did not want to discuss the matter.
>
> If an objection had been made at that time, I would have sustained it, and I would have ordered that answer stricken. And I am now ordering it stricken, and I am instructing you to disregard it.
>
> Every person, when arrested, has the right to decline to discuss the charge that has been made against him. That is a right that all of us enjoy, you and me and everyone else, and you should disregard to the greatest extent that you are humanly capable any reference to the fact that at the time of his arrest, Mr. Mandell elected not to discuss the matter with the agent.

Tr. 905. The answer was not discussed by the government during its closing argument. Defendants' post-trial motion failed to list this question and answer as error.

 Under the circumstances of this case, although we do not condone the lack of foresight shown by the prosecutor in asking the question, we do not think Mandell's right to a fair trial was prejudiced by the agent's answer. This is a far less egregious case than *Bridges,* where questions eliciting the impermissible response were asked on three sepa-

---

**15.** The complete relevant testimony was:

"Q. Now, after completing the search, what, if anything, did you say?

"A. After completing the detailed search of Mr. Mandell's person, and verifying his identity thought [sic] the various pieces of identification papers that he had with him, I then advised him that he had certain rights under the constitution; namely that he was under no obligation whatsoever to speak to us about the case in question; that if he did decide to say anything to us, that what he did say would be taken down and used against him in court; that he had the right to the advise [sic] of an attorney; that if it turned out that he was not able to afford an attorney, the court would appoint one for him; that if he did decide to answer any questions that we were to ask him, he had the right to stop at any point during the questioning, at which point we would discontinue.

"Q. And what, if anything, did he say?

"A. Well, at his point, Mr. Mandell told me that he was a practicing attorney and he was very much aware of his rights; that he understood everything I was speaking to him about when it came to the rights that I had explained.

"Notwithstanding that, I asked that he take the time to read a form which I handed to him, which is a form setting out the rights that I had explained to him. He did take the form and he did read it. He told us that once again he understood his rights, but he would rather not sign the form, and would rather *not discuss the case at this point.*

"Q. And did you say anything to him?

"A. Yes, I told him I would respect his decision not to talk about the case. Both Special Agent Munis and I witnessed the form. I then told him that I was somewhat curious about a few things.

"One of the first things I asked was whether or not—in view of the fact that he was a practicing attorney, and quite knowledgeable of the law and his rights, why he had been prompted to say what he had said to us earlier; that is, that we need not search him any further, what we wanted was in the envelope, at which point he replied to me that he knew that the only thing that could hurt him was actually in the envelope, and that was the reason he said it." Tr. 866–867.

rate occasions; *Matos,* where the improper question was asked after the prosecutor was informed during a voir dire that he was entering "troubled waters" and where the trial judge refused to give a cautionary instruction; or *Kroslack,* where the desire of the defendant to remain silent was elicited on two occasions, once after the prosecutor was specifically informed by defense counsel that he was "sailing into troubled waters again," and no cautionary instruction was given the jury. This is not a case involving deliberate prosecutorial misconduct. As the trial judge stated, "[M]y recollection is it was a perfectly innocuous question on its face." Tr. 902. We agree. At most the question and its response were harmless error.

Accordingly, the judgments entered by the district court, in all particulars, are

Affirmed.