**UNITED STATES ex rel. Charles McCLINDON, Petitioner-Appellee, Cross-Appellant,**

v.

**WARDEN, ILLINOIS STATE PENITENTIARY, STATEVILLE BRANCH, Respondent-Appellant, Cross-Appellee.**

Nos. 77–1197, 77–1198.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1977.

Decided March 27, 1978.

As Amended May 5, 1978.

William J. Scott, Atty. Gen., Thomas W. Connors, Asst. Atty. Gen., Chicago, Ill., for Warden, Ill. State Penitentiary.

Kenneth N. Flaxman, Chicago, Ill., for McClindon.

Before PELL, TONE and BAUER, Circuit Judges.*

BAUER, Circuit Judge.

Following a state jury trial, McClindon and his codefendant Millard Hubbard were convicted of murdering Leon Hunt on Janu-

---

* Justice Tom C. Clark (Retired) of the United States Supreme Court originally sat by designation and heard oral argument in this case, but died shortly thereafter. Judge Wilbur F.

Pell, Jr. was designated to replace Justice Clark on the panel and has reviewed the parties' briefs and a tape recording of the oral argument.

ary 21, 1968. After exhausting his state court remedies, McClindon sought federal habeas relief in the district court on the grounds that he had been convicted on the basis of insufficient evidence and that he had been denied the effective assistance of counsel at trial. The district court denied McClindon's insufficiency-of-the-evidence claim but agreed that McClindon was denied the effective assistance of counsel guaranteed by the Sixth Amendment because of a disabling conflict of interest resulting from trial counsel's efforts to represent both McClindon and his codefendant. Accordingly, the district court vacated McClindon's sentence and ordered that he be released from custody unless retried within 30 days. Execution of the final order was stayed by the district court pending this appeal, and this Court denied petitioner's motion for bail pending appeal.

The State appeals the district court's grant of federal habeas relief on the Sixth Amendment ground, and McClindon cross-appeals from the denial of his due process claim based on the insufficiency of the State's evidence. We affirm the district court's denial of McClindon's due process claim but reverse the grant of habeas relief and remand for further consideration of McClindon's ineffective-assistance-of-counsel claim.

## I.

We turn first to McClindon's claim that he was denied due process of law when he was convicted of murder on the basis of insufficient evidence. McClindon argues that the state appellate courts relied on a constitutionally impermissible inference drawn from his silence in affirming his conviction and that, absent such inference, his conviction is "totally devoid of evidentiary support." *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Before turning to the merits of his claim, however, we must review the evidence underlying his conviction.

The evidence presented at trial showed that Leon Hunt was murdered in the early morning hours of January 21, 1968 at the Chicago apartment of Virginia Williams. There were no eyewitnesses to the murder, and McClindon's conviction was based largely on inferences drawn from evidence derived from the testimony of Virginia Williams and her daughter Cassendra.

The evidence establishes that Virginia left the apartment at about 1:00 a. m. Shortly thereafter, Cassendra let McClindon and Hubbard into the apartment to see Hunt. When Virginia returned about twenty minutes later, she heard Hunt, McClindon and Hubbard arguing in the kitchen and told them to "take it outside" so as not to disturb her ill mother. The three men then stepped into a bathroom just off the kitchen, closed the door and continued arguing. A few moments later Virginia heard scuffling and a gunshot. She told Cassendra to leave and then went to a bedroom at the front of the apartment. As she did so, she heard two men rush past the room towards the front door. Cassendra, who was standing on the front porch, saw Hubbard tucking a gun into his belt as he and McClindon ran by her. Virginia found Hunt lying unconscious in the kitchen. He had been shot, cut on the ear, and was bleeding from his mouth. Soon thereafter, he died.

The State pursued an accountability theory of guilt at trial. Neither McClindon nor Hubbard testified at trial, and no evidence was presented on their behalf. On appeal from their convictions, the defendants argued that the evidence was insufficient to support their convictions because there was no proof as to who fired the fatal shot and no proof that they were acting in concert. In the course of rejecting the defendants' contention, the intermediate appellate court commented:

> "The evidence proved, beyond a reasonable doubt, that the defendants failed to offer an explanation for their conduct, either immediately before, during or after the killing of Leon Hunt. This failure was inconsistent with the behavior of persons similarly situated and innocent of the crime which was committed." *People v. Hubbard*, 4 Ill.App.3d 729, 733, 281 N.E.2d 767, 771 (1st Dist. 1972).

On further appeal to the Illinois Supreme Court, the defendants again pressed their argument regarding the insufficiency of the evidence and cojoined it with the contention that the lower appellate court had unconstitutionally shifted the burden of proof simply because they refused to waive their Fifth Amendment right not to incriminate themselves. The Illinois Supreme Court disagreed. Addressing the defendants' insufficiency-of-the-evidence claim, the court said:

"[W]e find support for the verdicts in the fact that the defendants came to the apartment together late at night. Regardless of who started the argument or what it was about, the evidence showed that the defendants were standing in the kitchen arguing loudly with Hunt. When told to take their argument outside, . . . they stepped into the washroom which adjoined the kitchen and continued their argument. Following the shooting the two defendants fled from the house and Hubbard was seen putting the gun in his belt as he fled. McClindon did not surrender until two days later and Hubbard did not surrender until a week after the shooting. There is no showing that either defendant disapproved or opposed the commission of the homicide. We find that the conduct of each defendant in this case is not consistent with that of an innocent man. From the facts and circumstances in evidence the jury could reasonably find each defendant guilty." *People v. McClindon,* 54 Ill.2d 546, 301 N.E.2d 290, 292 (1973), *cert. denied,* 415 U.S. 922, 94 S.Ct. 1593, 39 L.Ed.2d 889 (1974).

The court also rejected the defendants' contention that the lower appellate court had impermissibly shifted the burden of proof. Although agreeing that the lower court's language was "extremely broad and susceptible of misinterpretation," the Supreme Court believed that the lower court was simply pointing out that inferences of guilt could be drawn from the defendants' conduct, and that the evidence supporting those inferences stood unrebutted at trial:

"The conduct [of the defendants] was evidence from which the jury could draw inferences. The defendants had an opportunity during the trial to explain their conduct just as any defendant has an opportunity to explain, rebut or contradict any evidence presented against him. In the absence of any explanation, rebuttal or contradiction the evidence stands unchallenged before the jury. This court has stated concerning conduct similar to that involved in this case: 'In the absence of explanation, such conduct is not consistent with that of an innocent person similarly situated, and is sufficient to support an inference that a common understanding or design existed.' The application of this principle does not constitute an unlawful shifting of the burden of proof to the defendant, nor is any fifth amendment violation involved." *Id.* at 548–49, 301 N.E.2d at 293 (citations omitted).

On appeal here, McClindon renews his argument that the Illinois courts impermissibly shifted the burden of explaining his conduct and drew an inference of guilt from his refusal to testify. Absent such inference, McClindon claims, his conviction is unsupported by evidence sufficient to support his conviction. We disagree.

In this federal habeas proceeding, of course, we do not sit in review of the Illinois Supreme Court's determination that the evidence was sufficient as a matter of state law to support McClindon's conviction. Our only concern is whether the conviction is "so devoid of evidentiary support as to raise a due process issue." *United States ex rel. Johnson v. Illinois,* 469 F.2d 1297, 1300 (7th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1560, 36 L.Ed.2d 313 (1973). The question, thus, is not the sufficiency of the evidence as such, but rather "whether this conviction rests upon any evidence at all." *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). We believe that it does.

The evidence is undisputed that McClindon and Hubbard went to Williams's apartment together late at night to see

Hunt. All three were engaged in an argument, and the fact that the three men all went into the bathroom together to continue the argument suggests that, whatever its subject, the argument was over a matter of common concern to McClindon and Hubbard. The defendants fled the apartment together, and neither endeavored to assist the victim or inform the police about the other's conduct. We believe, as did the Illinois courts, that this conduct provided a reasonable basis for the jury to have inferred that the defendants were acting in concert and were legally accountable for one another's conduct.

Nor do we believe that the Illinois courts shifted the burden of proof to the defendants or drew impermissible inferences from their failure to testify. What the courts were saying is that the defendants' conduct at the scene of the crime provided a reasonable basis from which the jury could infer the defendants' guilt on an accountability theory. Simply put, the State's evidence was sufficient to support a finding that the defendants were acting in concert, and the defendants gave the jury no reason not to draw the inference of concerted action permitted by the State's evidence. Thus, absent explanation of their joint conduct, inferences of guilt could be drawn. However, it was not the defendants' silence that supported those inferences, but rather their conduct at the scene of the crime. All the Illinois courts were saying is that, as the defendants' conduct was never explained, the inferences the jury drew from their conduct—not their silence afterwards—were reasonable and sufficient to support the verdicts. We agree and affirm the district court's denial of McClindon's due process claim founded upon the insufficiency of the State's evidence.

## II.

McClindon next claims that he was denied the effective assistance of counsel at trial because trial counsel's loyalties were divided as a result of his jointly representing Hubbard and McClindon. *Glasser v. United States*, 315 U.S. 60, 76–78, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Gaines*, 529 F.2d 1038, 1043 (7th Cir. 1976). The district court agreed that trial counsel's determination that he could faithfully represent both defendants breached "minimum standards of professional representation" and therefore established that McClindon had been denied the effective assistance of counsel. *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 641 (7th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). We reverse and remand for determination of disputed questions of fact bearing upon McClindon's claim that the district court found unnecessary to resolve.

Apart from the question of whether Hubbard and McClindon were jointly represented at trial, the facts underlying McClindon's ineffective-assistance-of-counsel claim are in dispute. Principally the factual disputes concern how the defendants came to be represented by the same attorney and what the defendants told the attorney concerning the events of January 21, 1968.

McClindon's trial attorney, Walter Pride, testified at the evidentiary hearing held below that McClindon called him after Hunt's death and asked for assistance in surrendering to the authorities. Pride invited McClindon to come down to his office to discuss the matter. At that meeting McClindon told Pride that he and Hubbard had gone to the Williams apartment to collect some money Hunt owed them as a result of a narcotics transaction, and that an argument had ensued. When telling Pride that the three went into the bathroom, McClindon said, "We went into the bathroom with him. We had a gun and a knife." McClindon said that Hunt had been killed while they were in the bathroom, that the defendants had fled the scene together, and that there had been no eyewitnesses to the actual killing.

Pride further testified that it was McClindon who suggested that Pride represent both defendants for a joint fee of $3,000, and that McClindon said that Hubbard had already agreed to this procedure because they "were in it together [and]

would either walk together or go down together." Pride reluctantly agreed and told McClindon that an exception could be made in this case because the facts, as related by McClindon, indicated that the evidence brought out at trial would be the same against both defendants. Under the circumstances, Pride told McClindon, "representing two would be almost tantamount to representing one." Pride testified that at this initial meeting he advised McClindon of the theory of accountability of one person for the acts of another, and that McClindon said that he was familiar with the accountability statute and knew that he and Hubbard were in this together. McClindon informed Pride that Hubbard would get in touch with him soon.

Pride further testified that Hubbard called him a few days later to make arrangements for his surrender. According to Pride, Hubbard gave the same version of events as McClindon had, and at no time during the course of his relationship with the defendants did either of them deviate from their story.

During the trial, Pride told the defendants that they should discuss whether either or both of them should take the stand. Apart from advising McClindon that his prior felony convictions could be brought out on cross-examination if he took the stand, Pride never advised either of the defendants not to testify. After discussing the matter together, the defendants told Pride, "We will leave it where it is. We will either walk or we will go down together."

Pride also testified that, after the trial, Hubbard retained him to ask McClindon to sign an affidavit stating that McClindon had fired the shot that killed Hunt. According to Pride's testimony, McClindon said he would do so if Hubbard paid him $15,000.

At no time during the course of their relationship, said Pride, did McClindon ever express any objections about the representation he was receiving or complain of being shortchanged in favor of Hubbard. Indeed, Pride testified, he was representing McClindon on two unrelated robbery charges throughout the course of McClindon's murder trial.

The testimony of McClindon and Hubbard sharply contradicts Pride's testimony. According to McClindon, he told Pride from the outset of their relationship that it was Hubbard who had pistol-whipped Hunt while McClindon and three other men stood by, and that the gun had accidentally discharged while the six men were standing in the kitchen. McClindon also said that he never suggested to Pride that he should represent both defendants.

McClindon further testified that, when he asked Pride prior to trial whether the other men present at the Williams apartment during the shooting would be called as witnesses, Pride put his inquiry off by indicating that he would consider it at a later time. McClindon claims that he was thoroughly dissatisfied with Pride's representation, and that he did not fire Pride only because Pride would not refund the retainer McClindon had advanced, and McClindon had no confidence in court-appointed attorneys. McClindon also testified that Pride had advised both defendants not to testify because the prosecution did not have a convincing case, and denied that he told Pride he would sign an affidavit at Hubbard's behest if Hubbard would pay him $15,000.

Hubbard's testimony by and large tracks McClindon. According to Hubbard, Pride had called Ms. Julia Williams in an effort to reach Hubbard to solicit his representation. Hubbard returned the call and hired Pride because he told Hubbard that he was pretty sure he could beat the case. Hubbard testified that he told Pride prior to trial that there were other witnesses to the shooting, and that the shooting had occurred in the manner McClindon had described at the evidentiary hearing held below. Hubbard also testified that Pride had advised the defendants not to testify at trial.

The district court, in ruling on McClindon's Sixth Amendment claim, believed that the disputed questions of fact bearing upon how McClindon and Hubbard came to be represented by the same attorney, and

what they told trial counsel prior to and during trial about the alleged murder were "not material to this case." Presumably the district court's belief that these questions of fact were immaterial stems from its view that, as a matter of law, no attorney who met minimum standards of professional competency would have undertaken the joint representation of McClindon and Hubbard in the circumstances of this case. That determination, in turn, was based upon "the Court's familiarity with the trial of criminal cases" and the "expert testimony of Patrick Hughes," who testified at the evidentiary hearing that, in his opinion as an expert in the defense of persons accused of crime in the Illinois courts, an attorney who met minimum standards of professional representation would not have undertaken the joint defense of McClindon and Hubbard in the circumstances of this case.

▆▆▆ It is well settled, of course, that the Sixth Amendment's guarantee of the assistance of counsel includes the right to counsel who meets minimum standards of professional representation and whose loyalties are not divided between clients with conflicting interests. *United States v. Gaines,* 529 F.2d 1038, 1043 (7th Cir. 1976); *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). It is likewise the law, of this Circuit at least, that the primary responsibility for avoidance of a professional conflict of interests rests with the bar and not with the court. *United States v. Kidding,* 560 F.2d 1303, 1310–11 (7th Cir. 1977). Moreover, "common representation, without a showing of conflicting interests, is not in itself a violation of the Sixth Amendment." *United States v. Mandell,* 525 F.2d 671, 677 (7th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976).

In this case, we must decide whether McClindon's attorney violated "minimum standards of professional representation" by agreeing to represent both McClindon and Hubbard at trial. We conclude that this question cannot be answered until the disputed questions of fact bearing on how the joint representation came about and what McClindon and Hubbard told Pride about their involvement in the crime are resolved by the district court.

In holding that Pride's decision that he could loyally represent both McClindon and Hubbard failed to satisfy minimum standards of professional representation, the district court appeared to be of the view that a disabling conflict of interest inhered in the fact that the only plausible theory of defense open to McClindon at trial was that Hubbard had killed Hunt, and that McClindon had been an innocent bystander. Accordingly, even accepting as true the testimony given by Pride at the evidentiary hearing, his decision to represent McClindon and Hubbard failed to measure up to minimum standards of professional representation because his clients had inevitably antagonistic interests in the circumstances of this case.

It is true, of course, that the most plausible theory of defense open to McClindon in light of the evidence brought out at trial was that he was an innocent bystander to the murder of Hunt and fled the scene with Hubbard either under duress or because he did not believe the authorities would accept his "bystander" story in view of his prior criminal record. It is perhaps further true that any competent defense attorney would recognize that the best chance McClindon had for acquittal was to take the stand, implicate his codefendant and deny any involvement in or responsibility for his codefendant's conduct. However, if Pride's version of what McClindon had told him about the alleged crime is true, such a theory of defense was simply not open at trial unless Pride was prepared to suborn McClindon's perjury. Accordingly, if it is true, as Pride maintains, that McClindon said he and Hubbard were acting in concert in attempting to browbeat Hunt into paying the money he owed them by force or threat of force, then we believe that Pride could tentatively accede to McClindon's request that Pride represent both defendants without violating those "minimum standards of professional representation" that inform our determina-

tion of whether a criminal defendant has received the effective assistance of counsel guaranteed by the Sixth Amendment. As Pride observed at the evidentiary hearing, if his version of the facts related by McClindon is true, then his agreement to represent both defendants would be tantamount to agreeing to represent one because the evidence that he had reason to believe would come out at trial would be the same against both defendants. Naturally, if Pride had later been told a different version of the facts by Hubbard or learned of evidence that would exculpate one defendant but implicate the other, Pride would have had to refuse to represent Hubbard. Pride maintains, however, that Hubbard told him the same story McClindon had, and that the defendants never deviated from their view that they were both responsible for the murder and either would walk or go down together. Moreover, apart from Cassendra Williams's testimony that she saw Hubbard tucking a gun into his belt as the defendants were fleeing the scene of the crime, there was in fact no disparity in the evidence presented against the defendants at trial. And, that disparity in the evidence came out late in the prosecution's case in chief, and thus could not affect the integrity of Pride's initial decision to represent both defendants at trial.

■ Accordingly, we hold that the district court erred in deeming immaterial the disputed questions of fact bearing on how the joint representation came about and what Hubbard and McClindon told Pride about their involvement in the crime charged. In holding that, no matter how those questions of fact were resolved, Pride had violated minimum standards of professional representation as a matter of law merely by agreeing to represent both defendants at trial, the district court erred. Common representation, absent evidence that a conflict of interests actually existed, is not of itself a violation of the Sixth Amendment. *United States v. Mandell,* 525 F.2d 671, 677 (7th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976). Likewise, absent information giving an attorney reasonable cause to believe that a conflict of interests exists, minimum standards of professional representation are not violated by his agreeing to represent codefendants at a criminal trial. Thus, if Pride's testimony is accepted as true, McClindon has not shown that he was denied the effective assistance of counsel because Pride says that he never had any reason to believe that his clients had antagonistic interests. Accordingly, the district court's application of a per se rule in the circumstances of this case must be reversed.

Notwithstanding the above, McClindon argues that a remand to the district court is unnecessary because an alternative basis exists for affirming the district court's judgment. It is contended that, once the evidence of Hubbard's possession of the murder weapon during flight came out at trial, Pride violated minimum standards of professional representation by not attempting to exploit this disparity in the evidence on McClindon's behalf. Moreover, says McClindon, he was denied the effective assistance of counsel when Pride did not withdraw from his joint representation once this disparity in the evidence came out because Pride's continuing responsibilities to Hubbard clouded his judgment and effectively precluded him from making a dispassionate assessment of whether the disparity of the evidence should be argued on McClindon's behalf. We disagree.

■ As petitioner himself appears to recognize, the decision of whether or not to argue the disparity in the evidence on behalf of McClindon necessarily involved an exercise of discretionary judgment on the part of experienced trial counsel. The fact that Hubbard was holding the gun at the time the defendants were fleeing the scene of the crime does not, after all, tend to refute the State's theory of prosecution that the defendants were acting in concert and therefore that it simply did not matter who fired the shot that killed Hunt. Indeed, experienced defense counsel representing McClindon alone might well believe that emphasis upon who was carrying the murder weapon during the defendants'

flight might well distract the jury from the theory of defense that a reasonable doubt about each defendant's guilt must exist precisely because there was no evidence conclusively establishing which defendant fired the murder weapon and whether the defendants were acting in concert. We cannot say that, as a matter of law, an attorney representing McClindon who met minimum standards of professional representation necessarily would have argued the disparity in the evidence.

Nor do we agree with McClindon's argument that Pride's joint representation of both defendants disabled him from making a dispassionate and informed judgment about whether or not to argue the disparity in the evidence on behalf of McClindon. Even if we assume *arguendo* that Pride could not, consistent with his duties to both clients, have actually argued the disparity in the evidence on McClindon's behalf at trial, he could at least determine whether it would be in McClindon's best interests to argue the disparity in the evidence without violating his professional responsibilities to Hubbard. Pride's attorney-client relationship with Hubbard did not preclude him as a matter of law from making a good faith determination as to whether the disparity in the evidence should be argued on McClindon's behalf, and there is no evidence establishing that he was deterred from making such a tactical determination because of any concern over violating his duties to Hubbard. We decline to hold that, as a matter of constitutional law, Pride was disabled from making an objective determination of what tactics would best serve McClindon's interests because of the allegedly paralyzing influence of his responsibilities to Hubbard.

Accordingly, for the reasons noted above, we reverse the district court's grant of habeas relief and remand this case for further proceedings consistent with this opinion.

On remand, the outcome of this case will turn largely on credibility determinations and findings of fact relative to how the joint representation came about and what McClindon and Hubbard told Pride about their involvement in the crime. Those determinations and findings are, of course, within the exclusive province of the district court. Frankly, we do not envy the court its task. This is a complicated case, and much is at stake—an attorney's professional reputation and integrity, and a convicted murderer's personal freedom. Years have elapsed since the events at issue, and the passage of time and fortunes of circumstances have not only dulled memories but created both the opportunity and incentive to create new ones. It is not our place to determine who is telling the truth, but we do urge the district court to clearly set forth the factors influencing its credibility determinations and to specify the particular facts found upon which the court relies in reaching the conclusions of law adopted on remand. This would make our task much easier on appeal, if there be one.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

TONE, Circuit Judge, dissenting.

While I agree with Part I of the opinion for the court, I would affirm the judgment because the record shows that McClindon was not adequately advised of the dangers of multiple representation. If he had been, his decision to retain Pride would have been a waiver. *United States v. Gaines*, 529 F.2d 1038, 1045 (7th Cir. 1976). Because such advice was not given, however, there should be a new trial.

If the facts are as stated by Pride in his testimony, neither he nor any other counsel could have advised McClindon to take the stand and offer self-exculpatory testimony without suborning perjury. The Sixth Amendment would not be violated by a denial of such advice.

Pride, or other counsel representing McClindon, could, however, without suborning perjury or otherwise violating his duty as an officer of the court, have pointed in his closing argument to shortcomings in the prosecutor's case. Thus he could have pointed out that it was Hubbard who was seen putting the gun away as the two men

fled the scene of the crime and that the evidence did not demonstrate that McClindon either participated in the use of deadly force or had advance knowledge of a possibility that Hubbard would use such force. This argument, however, would have hurt Hubbard's defense. With the interests of his two clients thus in conflict, Pride was disabled by his representation of Hubbard from deciding solely on the merits whether to make such an argument.

Absent an adequate warning before trial by counsel or the state trial judge as a predicate to McClindon's decision to be represented by the same counsel as his codefendant, that judge had a duty to intervene when the testimony that Hubbard was carrying the gun exposed the conflict of interest. As we said in *Gaines,*

> When the possibility of a conflict appears during trial, the court must investigate the relevant facts, advise the defendant, and determine whether continued representation, absent waiver, would violate the sixth amendment.

529 F.2d at 1043. Further,

> When an actual conflict appears, the court must bring the fact of its existence and the resulting dangers which are reasonably foreseeable to the attention of each affected defendant so he can make an informed judgment at that time as to whether he wishes new counsel or wishes to continue with present counsel. Having done that, the court has fulfilled its duty and, if, despite the conflict and the attendant dangers, the defendant elects to continue with the same counsel, he thereby waives his sixth amendment right.

*Id.* at 1044 (footnote omitted). Neither the trial judge nor counsel gave the required warning before trial or when the conflict developed. McClindon is therefore entitled to a new trial.