STATE OF NEBRASKA, APPELLEE, V.
MAGELLAN HUDSON, APPELLANT.
STATE OF NEBRASKA, APPELLEE, V.
FLOYD MAEBERRY, APPELLANT.

305 N.W.2d 359

Filed May 1, 1981. Nos. 43277, 43278.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein for appellants.

Paul L. Douglas, Attorney General, and Mark D. Starr for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

WHITE, J.

Defendants Hudson and Maeberry appeal from a judgment of conviction in the District Court for Douglas County, Nebraska, for the crime of first degree sexual assault. Defendant Hudson was sentenced to a term of 1½ to 3 years' imprisonment, and defendant Maeberry to a term of 1 to 2 years' imprisonment with credit for time served prior to trial. Defendants appeal their convictions. We reverse and remand for a new trial.

The evidence established that on September 26, 1979, at about 2 p.m., the prosecutrix was walking from her job to her home on South 27th Street in Omaha, Nebraska. Near 24th and Farnam Streets she was approached by defendant Hudson and asked if she "wanted to party" and "smoke some angel dust." Defendant Maeberry was in a nearby drugstore and joined Hudson and the prosecutrix while they were

talking. It was agreed that all three would go to the prosecutrix's apartment. They did so, with the prosecutrix unlocking the apartment door so they could enter. She did not lock the door from the inside once they were all in the apartment but did notice later that it had been locked. In a pretrial deposition she stated that defendant Hudson locked the door from the inside, but at trial she testified that "the last person in" locked it and that she could not remember which defendant that was.

The apartment contained a living room, dining room, kitchen, bathroom, dressing room-closet combination, and a Murphy bed which pulled down out of the wall into the living room. The prosecutrix supplied the defendants with drinking glasses for wine which defendant Maeberry had brought in, and all three sat down on a couch in the living room. Defendant Hudson then lit a rolled cigarette and passed it to the other parties. He then attempted to kiss the prosecutrix.

The prosecutrix's version of the next-recited incidents are to a large degree contradicted by the testimony of the defendant Maeberry, who was the only defendant to testify at trial.

According to the prosecutrix, Hudson asked her to accompany him into the bathroom to snort some cocaine. As she entered the bathroom, Hudson shut the door and ordered, "Take off your clothes, bitch." The prosecutrix rolled over into the corner of the bathroom and began crying, and Hudson threatened that he would hurt her if she did not keep quiet. He then began to choke her and she lost consciousness. When she regained consciousness, Hudson was removing her slacks. He then took her into the dressing room from the bathroom and forced her to perform fellatio. Next he ordered her to pull down the Murphy bed in the living room and lie on it and Hudson then had vaginal intercourse with her. Defendant Maeberry was on the couch during all these events. After Hudson engaged in intercourse with the prosecutrix on the bed, Mae-

berry disrobed and also engaged in vaginal intercourse with her. Thereafter the defendants forced her to bathe, and each had vaginal intercourse with her after the bath. While Maeberry was engaging in intercourse with her this second time, Hudson again forced her to perform fellatio. Hudson then ransacked the apartment and she later found that a flute, some jewelry, and $100 cash was missing. At no time during the intercourse on the bed did she resist the defendants because she was afraid they would hurt or kill her.

Following the above-described events, defendants then insisted that the prosecutrix accompany them to California to work as a prostitute. As the three were walking down the steps to leave her apartment building, she jumped behind a young man in the hallway and began to cry that she had been raped. Hudson immediately left the building. Maeberry stayed behind to deny to the young man that he had raped the prosecutrix, but left when the young man suggested he do so. The young man then assisted the prosecutrix in telephoning a friend who took her to Lutheran Hospital. Police were summoned. The examination of the prosecutrix at the hospital established that she had engaged in sexual relations and had marks on her throat. Police made an investigation and defendants were subsequently arrested and charged.

Defendant Maeberry's testimony was that, while the prosecutrix and Hudson were in the bathroom, the door was open and that he neither saw nor heard evidence of violence or threats upon the prosecutrix by Hudson. He maintained his belief that all the sexual acts which occurred were consensual, that the prosecutrix had asked defendants if she could go to California with them, and that the personal property was taken in order to get money for her bus ticket. On the way down the steps, according to Maeberry, Hudson then told the prosecutrix she could not accompany them to California and just after that she jumped behind

the young man and began crying that she had been raped.

Defendants assign a number of errors, but we shall discuss only one: Whether the District Court committed reversible error in overruling both defendants' objections to consolidation of their cases for trial.

Defendants were represented by two staff attorneys from the Douglas County Public Defender's office. Each attorney participated actively in the trial and it is apparent that each was representing both defendants. Before trial, counsel for the defendants objected to the State's motion to consolidate the cases for trial, but there is no indication from the record that arguments were heard on the motion or the objection. At no time before, during, or after the trial did counsel ask the trial court that separate counsel working independently of one another be appointed for the defendants, although, under the above-mentioned assignment of error, they argue strenuously in their brief that a conflict of interest existed between the two defendants. We treat the above assignment as one dealing with appointment of separate counsel, and agree with the defendants.

The prosecutrix's testimony showed that the threats and violence which accompanied the sexual penetration, thereby making it a forcible assault, were all made or perpetrated by defendant Hudson out of Maeberry's presence. It is defense counsel's argument on appeal that the jury could have found Maeberry innocent of any knowledge of threats or violence accompanying the incidents, and thus innocent of forcible penetration. However, defense counsel now argue that, in order to maintain a full defense of consent for both defendants, it was necessary for them to ignore elements of the prosecutrix's testimony which could have helped Maeberry to the detriment of Hudson. They argue that they could have impeached her more vigorously on the disparity of her deposition and trial statements as to who locked the apartment

door from the inside in order to exonerate Maeberry had it not been so perilous to Hudson's consent defense. Also, the prosecutrix testified that, while the threats and violence were occurring in the bathroom, the door from that room to the living room was closed. Maeberry testified that it was open and that he heard no threats or violence. It would have been to Maeberry's advantage, but not Hudson's, if counsel could have stressed that the bathroom door was closed and that Maeberry had no knowledge of the threats and violence undertaken by Hudson. Counsel argue that they were forced to forego this opportunity to rehabilitate Maeberry at the expense of Hudson in order to protect Hudson's interests.

We agree that there was a conflict between the interests of the defendants at trial which called for separate representation. However, defense counsel never brought the issue to the trial court's attention. The question for decision then becomes: If defense counsel do not raise the conflict issue at trial, is the trial court under a duty in a multiple representation case to initiate any inquiry along those lines on its own motion?

The most recent statement of the U.S. Supreme Court on this question appears in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). In *Cuyler*, three defendants, all charged with the murder of two people, were represented by two attorneys at separate trials. Sullivan was convicted after resting his defense at the end of the state's case. The other two defendants were subsequently acquitted at their trials. During none of the trials did any defendant suggest to the court that a possible conflict of interest existed which would prohibit multiple representation. The Supreme Court held that "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." The court went on to hold that, without special circumstances which would create a

duty of inquiry, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" in order to gain reversal of a conviction. *Cuyler* at 347-48.

The record in the present case does not demonstrate that defense counsel ever raised the conflict issue with the trial court. Thus, we must decide whether "special circumstances" existed which should have alerted the trial court to a possibility of a conflict arising between the interests of the defendants.

In finding that no special circumstances existed in *Cuyler* which would have put the trial court on notice of a possible conflict, Mr. Justice Powell noted that there were separate trials; no objections were made to the multiple representation; that defense counsel's "opening argument . . . outlined a defense compatible with the view that none of the defendants was connected with the murders"; and that defense counsel's decision to rest at the end of the state's case was a legitimate trial tactic based on the weakness of the state's case against Sullivan and not a red flag to the trial court of a possibility of conflict. *Cuyler* at 347.

In the present case, the record shows only an objection to the State's motion to consolidate, without more. Nothing in the record indicates that the possibility of conflicting interests was brought to the trial court's attention by defense counsel. At a pretrial hearing on another matter, the following colloquy between the court and defense counsel took place: "THE COURT: I would assume that — and I'm only assuming because no one's made it a matter of record yet — that consent is a defense in this?

"MR. FRANK [defense counsel]: Yes, Your Honor.

"THE COURT: All right.

"MR. SIGLER [State's attorney]: And that's as to both?

"MR. FRANK: Yes. . . ."

Counsel made no mention of conflict either in this hearing or in any of the in camera hearings during the course of the trial. Defense counsel's treatment of trial testimony referred to above, both as to the prosecutrix's testimony and to Maeberry's, would not of itself rise to the level of "special circumstances" sufficient to impose a duty of inquiry on the trial court as to conflict, since both represent legitimate trial tactics based on a mutual defense of consent.

However, after the jury was instructed, retired, and began deliberating, the trial court requested it to stop its deliberation and return to the courtroom for further instruction. At that time the court gave an aider and abettor instruction, even though it had earlier informed all counsel that it would not honor the State's request to give that instruction. The instruction emphasized the difference between the respective roles played by Hudson and by Maeberry in the alleged assault, and the resulting peril of their being represented by the same counsel.

The *Cuyler* opinion places significant emphasis on the fact that there were separate trials for the codefendants in finding that no special circumstances existed. "The provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests." *Cuyler* at 347. In the present case, however, the trial was consolidated and, in fact, the court specifically denied a defense request for separate trials. While an objection to consolidation, without more, does not of itself bring about the requirement of an inquiry into conflict, we think that it should place the trial court slightly more on its guard to inquire when divergence between the defendants' interests becomes apparent as it did here when the trial court recalled the jury to give the aider and abettor instruction. Although the primary responsibility of watching for conflict remains on the bar, the trial court must still be "watchful for indicia of conflict during the trial." *United States v. Mandell*, 525 F.2d

671, 677 (7th Cir. 1975).

As noted in *United States v. Carrigan*, 543 F.2d 1053, 1055 (2nd Cir. 1976): "When a potential conflict of interest arises . . . the proper course of action for the trial judge is to conduct a hearing to determine whether a conflict exists to the degree that a defendant may be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the Sixth Amendment." In light of *Cuyler*, this hearing must take place when the requisite "special circumstances" arise. At the time, then, when the trial court in the present case gave the aider and abettor instruction, it should have held this type of hearing since it apparently had recognized a divergence in the respective levels of participation in the alleged assault of each defendant, indicating a possible conflict in their interests. See *Wood v. Georgia*, 49 U.S.L.W. 4218, decided March 4, 1981. Since this hearing was not held, we reverse and remand for a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.

CLINTON, J., dissents.

BOSLAUGH, J., dissenting in part.

I am unable to discern how the defendant Hudson was prejudiced by the joint trial. I would affirm the judgment as to Hudson.

HASTINGS, J., joins in this dissent.